THE CITY OF PANA, Appellee, *vs.* THE CENTRAL WASHED
COAL COMPANY, Appellant.

*Opinion filed October 28, 1913.*

1. NUISANCES—*jurisdiction of equity to enjoin a nuisance will
be exercised with caution.* Courts of equity have jurisdiction to
grant relief against either public or private nuisances by compel-
ling their abatement, but this jurisdiction will be exercised with
caution and only in extreme cases, unless the rights of the parties
and the fact of the nuisance have been settled in an action at
law, in which case granting an injunction is a matter of course.

2. SAME—*a municipal corporation may, in a proper case, call
upon court of equity to abate nuisance.* A municipal corporation,
in the exercise of the power granted to it by the State to abate
nuisances, may, in a proper case, call upon a court of equity for
assistance, but if there is a substantial dispute as to the facts or
the law, and the question is in doubt, a trial at law will be re-
quired before a court of equity will intervene.

3. SAME—*when an obstruction of alleged streets is not a nui-
sance per se.* The obstruction of alleged streets by buildings and
slack piles of a coal washing company does not constitute such
a nuisance *per se* as will justify interference by a court of equity
before the facts and the rights of the parties have been settled
in an action at law, where such condition has existed for many
years and it does not appear that the public has suffered any in-
convenience or that travel is prevented or seriously incommoded
by such obstruction.

4. SAME—*when recovery of judgments at law does not estab-
lish right to injunction.* The fact that a city has recovered sev-
eral judgments at law against a coal washing company for vio-
lating ordinances providing for the abatement of nuisances does
not establish the city's right to an injunction, where such judg-
ments are all pending on appeal.

5. SAME—*what necessary in order to authorize injunction be-
fore fact of nuisance is established at law.* In order to authorize
an injunction to restrain the continuance of a business which is
not a nuisance *per se,* before the fact of the nuisance has been
established at law, the law must be beyond question and the facts
must be clearly established and must show a case of pressing ne-
cessity for interference by a court of equity.

FARMER, J., dissenting.

APPEAL from the City Court of Pana; the Hon. PAUL McWILLIAMS, Judge, presiding.

E. E. DOWELL, and E. A. HUMPHREYS, for appellant.

ARTHUR FITZPATRICK, City Attorney, and TAYLOR & TAYLOR, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill for injunction filed by appellee against appellant in the city court of the city of Pana, in Christian county, and heard at its February term, 1913, alleging that appellee is a municipal corporation whose duty it is to protect the health of its citizens, regulate the control of its streets and alleys, declare what are nuisances and abate the same; that appellant, owning a large number of buildings, machinery and appliances, operated a coal washery in said city for removing impurities from coal; that in the operation of its business it had accumulated large quantities of waste matter, which it had piled, and continued to pile, upon its premises and upon a portion of the public streets of said city; that said refuse was continually burning and smoldering and giving off large quantities of poisonous and injurious fumes and odors, to the detriment of the health, comfort and happiness of the citizens of said city; that appellant had used large quantities of water to suppress the burning of said refuse and had made no provision for carrying off the same; that said water had been thrown upon the streets adjacent thereto and drained into the inlets and catch-basins and into the drainage system of the city and deposited large amounts of sediment therein, to the injury of the streets and drainage improvements, and that said company had made no provision for purifying said water, which carried sulphur and other poisonous matters, and that the same had been drained into ponds and sink holes, contrary to the ordinance of said city; that appellee had

brought divers suits against appellant for the violation of its ordinances providing for the abatement of nuisances and had recovered judgments, all of which said suits appellant had appealed to the circuit court of said county, and further alleging that there was no adequate remedy at law for the abatement of said nuisances. Appellant answered, admitting the ownership of said property but denying most of the material allegations of the bill, admitting, however, that six suits were instituted by appellee against appellant, which had been appealed, as aforesaid; that the first of these suits was instituted in August, 1912, although appellant had been conducting its business for seven years prior thereto. After the issues were joined evidence was heard before the sitting judge of said court, and a decree was entered requiring the abatement of said nuisance substantially as prayed. This appeal was taken from that decree.

The evidence is voluminous and in many respects is sharply conflicting. It tended to show that appellant's business was established in the city of Pana about six years before this litigation was commenced; that its washery building is located on ground which was at one time public streets of said city (Front and Walnut streets) by virtue of a common law dedication; that the premises occupied by appellant are bounded on the north by the Baltimore and Ohio railroad, which is located in what was originally Olive street; on the east by the Illinois Central railroad; on the south by the Big Four and the Chicago and Eastern Illinois railroads; and on the west by the premises, mine, engine room, tipple and other buildings and equipment of the Pana Coal Company; that the Illinois Central and Big Four railroads were constructed prior to 1870; that the Baltimore and Ohio railroad was placed at its present location about 1872, and that the Pana Coal Company's mines and buildings were placed at their present location in 1883 and 1884. A reference to the accompanying plat will show the proximate location of the streets and former streets, as

well as the buildings, ditches, reservoirs and other portions
of the washer plant and vicinity:

Walnut street was originally platted across and ex-
tended south of the Baltimore and Ohio right of way as

far as the north boundary line of the present rights of way of the Chicago and Eastern Illinois and Big Four Railroad Companies, but has never been opened across their tracks, although south of those tracks it begins again and continues south. Of all of these north and south streets touching the premises in dispute, State street is apparently the only one that is now open or has ever been opened across the territory. On the north of these premises Olive street extends east and west their whole distance. This seems to be almost entirely occupied by the Baltimore and Ohio tracks. The next street originally platted south of this was Front street. Upon the block immediately west of State street, between the Baltimore and Ohio and Big Four rights of way, is a large pond or basin (No. 2.) The southern part of this pond extends across what would have been Front street if that street had been extended, and the pond extends some little distance west of the west line of Clay street extended. Just west of the west end of this pond is a natural ditch, originally some six or eight feet deep, running north, draining all the surface water in this section of the city. West of this ditch are two small ponds (Nos. 3 and 4.) All three of these ponds have been used as settling basins by the appellant company. Ponds 3 and 4 were constructed since the buildings of the washer company were constructed. Pond 2 was constructed by the coal company many years ago. The washer company's buildings are located partly on what were originally Front and Walnut streets and partly on the right of way of the Big Four Railroad Company. The evidence shows that these buildings and the machinery were constructed in 1906 and 1907 at a cost of $55,000. The block between the two railroads and just east of Walnut street, as originally platted, is all owned by appellant. It claims that it also owns all of what was originally Front street east of Walnut street not now occupied by the tracks of the various railroads heretofore named. To the north and east of the washer building of

appellant are piles of refuse, containing slack, sulphur, slate, black jack, blue-band and other material, amounting to approximately 50,000 tons and being some seventy feet high and about three hundred feet in circumference. These piles have been gradually accumulating. It appears that this refuse is in substantially two piles, although extending as one pile at least half the height. The evidence tends to show that this material is susceptible of spontaneous combustion, and has been burning and smoldering four or five years, more or less continuously; that when burning it gives off a sulphurous gas.

The evidence further tends to show that east of these piles of refuse or slack is a pond, called in the evidence pond 1, which covers a small portion of the north-east corner of said block 15, a part of Chestnut street and a part of Olive street; that east of this pond and east of Chestnut street is a small pond apparently on the right of way of the Illinois Central Railroad Company. From this last pond a vitrified pipe extends as an outlet into said pond 1. There is some evidence tending to show that on the south-easterly part of said slack pile is a small open ditch, from which the surface water flows into said pond 1. To the west from the north-west corner of said pond 1 extends an open ditch along the south half of the Baltimore and Ohio right of way in Olive street to the east line of Walnut street. This ditch is not deep enough to drain the pond but simply carries off the overflow. At the time of the hearing there was a small drain extending north across the Baltimore and Ohio right of way east of said Walnut street, which carried a part of the water into Walnut street. The evidence also tends to show that until a short time before this litigation there was no opening of any kind for this surface water to run across the Baltimore and Ohio right of way. The evidence is in sharp conflict as to how long pond 1 has existed. Some of the witnesses testified that it was not then as large or the water as deep as it was before appellant's buildings

were erected, while others testified they did not think there was any pond there until after appellant's buildings were erected. There is some evidence tending to show that this pond was formerly drained by an open ditch west of Walnut street but that this ditch had been closed up by a former city administration. Pond 1 had water standing in it at the time of the trial, in February, 1913. Appellant has not been operating its machinery or carrying on its business or using any water since December 24, 1912. There is evidence tending to show that the water in the ditch north of Walnut street tends to discolor and kill the grass for a block or two north of the Baltimore and Ohio right of way. The weight of the evidence, however, tends to show that this water that has discolored the grass and killed it has come from the Pana Coal Company's plant as much or more than it has from said pond 1. The surface of said block 15 was from three to five feet below the grades of the railroads now on three sides of it. The testimony is in conflict as to whether the natural slope of block 15 was originally towards the east or west, several witnesses testifying as to each direction. It is apparent from the great weight of the testimony that since the Pana Coal Company's mine was sunk and its buildings erected west of Walnut street, in the early eighties, practically all of the surface water east of Walnut street could flow to the west over the surface only by being conducted in that direction by artificial drains, as the buildings and works of the coal company occupied all of the territory between the rights of way of the Big Four and Baltimore and Ohio Railroad Companies. At the time of the hearing there was a small drain leading from the north-east corner of the appellant's buildings, where they joined said slack piles, northerly in what was originally Walnut street, then in a north-westerly direction until it reached Olive street, then west to the east line of State street, where it turned and ran north on State street. Across the Baltimore and Ohio right of way at this

point there seems to have been originally an old box sewer, but at the time of the hearing the surface water that collected in this small drain apparently, if it escaped to the north along State street, soaked through the Baltimore and Ohio right of way. The ditch north of the Baltimore and Ohio railroad, east of State street, was about a foot deep and three or four feet wide. The evidence tended to show that the water in it appeared white and slimy, and there was also refuse from the coal scattered along its bottom. From the north-west corner of appellant's buildings at the time of the hearing there was a wooden trough leading from those buildings to pond or basin 2, as shown on the plat. This trough was about twenty-eight inches wide and ten inches deep. Through it apparently ran most of the waste water after being used by appellant in washing coal, carrying a large amount of sediment into the settling basin or pond 2, which at the time. of the hearing was nearly filled up with such settlings. Pond 2 was connected by an open wooden trough with pond 4. Pond 4 was connected with pond 3, and pond 3 had an opening into the ditch which was the natural channel running north across the Baltimore and Ohio right of way, finally turning easterly about a block north, into Clay street. This ditch at the time of the trial had a large vitrified pipe in it. The testimony tends to show that when appellant's works were running the waste water ran into pond 2, then into pond 4 and then into pond 3. When the sediment had largely settled, the employees of appellant allowed the water to run out of pond 3 into said natural ditch northerly into Clay street. The testimony tends to shows that even after this water was drained out of pond 3 it was muddy and black in color and filled with a good deal of coal sediment.

The testimony further tends to show that Walnut street lying between the said railroad rights of way, and Front street between State and Walnut streets, were used as public streets until the early eighties, when the Pana Coal Com-

pany opened its mine and erected its buildings between Walnut and State streets. The evidence as to how much either of these streets has been used since that date is not in entire harmony. The weight of the testimony of all witnesses is to the effect that neither of these streets adjoining appellant's premises has been worked or repaired by the public authorities for more than twenty years, if they were ever worked; that Front street has never been used as a public street for over twenty years. There is a dispute as to whether there was always a crossing over the Big Four railroad on Walnut street since that road was constructed, in 1870. There is some testimony tending to show that the first crossing was put down by the Pana Coal Company, and that recently the Baltimore and Ohio Railroad Company had made a crossing there so that teamsters could come in and haul away slack from the slack piles of appellant. The evidence tends to show that the principal portion of the teaming within that territory after the Pana Coal Company mine was established was by persons connected with that company; that after crossing the Baltimore and Ohio railroad on Walnut street they would drive around the boiler house, under the chutes of the coal company; that some of the same kind of travel exists there at this time as it has existed since the mine was established. The evidence also tends to show that while block 15 had residences and business houses located thereon during the 60's and 70's, including one or two hotels, these were gradually abandoned and moved away, and that at the time appellant acquired said property and started to construct its buildings there was but one house standing there, called the "Shockley House," which in 1907 was purchased by appellant. There is some evidence tending to show that groceries were delivered by wagon to the Shockley place as long as it was occupied, but the evidence tends strongly to show that south of the Baltimore and Ohio railroad track on that portion of Walnut street as originally platted there

was no particular route traveled with reference to street lines. There was also evidence tending to show that there was an electric light plant erected about where appellant's buildings now stand, many years before appellant's buildings were erected, but apparently it had been abandoned long before appellant purchased this property. Some of the testimony is to the effect that the electric light plant occupied a portion of Walnut and Front streets as originally platted. The weight of the evidence is also to the effect that for years before appellant erected its buildings, Walnut street north of where the buildings now stand was piled full of slack by the Pana Coal Company, to the amount, at times, of 5000 or 6000 tons, and that when appellant's buildings were erected it was necessary to excavate through sixteen feet of slack to reach the natural surface of the ground; that this slack extended sixty feet north of appellant's buildings and at least twenty feet east of the east end, and that there was at that time no evidence of any open or traveled streets within that space. There is a conflict in the evidence as to the amount of this slack piled there by the Pana Coal Company, and whether it entirely blocked the travel on Walnut street as originally platted, just north of Front street. We think, however, the testimony shows that for several years prior to the erection of appellant's buildings the slack was so piled in Walnut street that for at least sixty feet north of its buildings such street was impassable for public travel by teams. The evidence further tends to show that appellant, in washing the coal, uses about 700,000 gallons of water per month. Many of the witnesses who testified stated that they had never heard of Front street until this dispute arose. The evidence also tends to show that in the neighborhood and territory about appellant's plant large quantities of coal, gob, cinders, rock and other material were piled in the streets, and that many of the streets were originally built up or graded with cinders or slack; that the Pana Coal

Company piled its cinders immediately adjoining its buildings, which gave off sulphurous odors and gases, and that by the action of the elements the sediment from these places was carried into the ditches and drains and into the particular drains and ditches complained of by appellee. Many of the witnesses testified that they could not distinguish the odors and gases coming from appellant's slack piles from those that came from the locomotive engines that were continuously running on the railroads about the plant, while others testified that they thought they could distinguish the two sets of odors and gases.

Three witnesses testified for appellee as to unhealthful conditions arising from the seepage of the four ponds, it being the opinion of these witnesses that such seepage would contaminate the wells in that vicinity. Two of these witnesses were doctors. Both of them admitted that they knew of no wells that had been contaminated. The third witness was a coal miner, who said that he was certain two wells just north of the Baltimore and Ohio right of way would be contaminated by the seepage from these ponds, but it is evident from his cross-examination that this was purely a guess. No testimony was attempted to be offered by the appellee from the owners of any of the wells in the vicinity that they had been contaminated or by any witness who had made an examination of any of such wells. Many witnesses testified, both for appellant and appellee, that they were familiar with these premises and that they had never known of any injurious effects from the odors or gases in the vicinity of the property, although all conceded that the smell was disagreeable and sometimes more disagreeable than at others. There was no positive testimony from any witness that these odors or gases were noticed except immediately adjoining or close to the premises. The evidence showed that men, women and children were continually working about these slack piles picking up coal and hauling it away, there frequently being from one to thirty teams

engaged in that work. Much of this refuse was apparently being used to make streets in the city. The weight of the testimony is to the effect that the odors and gases from the slack piles were no more unsanitary and injurious to the health and happiness of the citizens of Pana than the odors and gas from the engines and the cinders of the Pana Coal Company or from the locomotives used upon the various railroads. From the photographs introduced as exhibits it is manifest that the slack piles are very unsightly.

Apparently the stockholders of the appellant company are, some or many of them, interested as stockholders in the Pana Coal Company, although the two companies seem to have different sets of officers. The evidence tends to show that most or all of the coal that is washed by appellant comes from the Pana Coal Company. Just how the two are related in a business way is not clearly shown from the evidence and is not material to the questions involved.

The first question presented for our decision is whether the facts presented on this record authorize relief by injunction. Courts of equity have power to give relief, whether against public or private nuisances, by compelling their abatement or restraining the continuance of their existence. This jurisdiction was not an original one and is of comparatively recent origin. The general rule is that it is exercised sparingly, with caution, and only in extreme cases,— at least until after the right and the question of the nuisance have first been settled at law. (29 Cyc. 1219, and cases cited.) "To be entitled to an injunction against a nuisance the plaintiff must present a case of pressing necessity and of injury for which there is no adequate legal remedy." (2 Joyce on Injunctions, sec. 1044; 2 Beach on Injunctions, sec. 1044.) "In all cases of this sort, courts of equity will grant an injunction to restrain a public nuisance only in cases where the fact is clearly made out upon determinate and satisfactory evidence, for if the evidence be conflicting and the injury to the public doubtful, that,

alone, will constitute a ground for withholding this extraordinary interposition.  *  *  *  The same doctrine is equally applicable to cases of private nuisance." (2 Story's Eq. Jur.—13th ed.—sec. 924*a;* and see to the same effect, 2 Joyce on Injunctions, secs. 1064, 1065; 2 Wood on Nuisances,—3d ed.—sec. 786; 1 High on Injunctions,—3d ed.— sec. 740.) The equitable doctrines applicable to public nuisances are essentially the same as those that apply to private nuisances.

Municipal corporations, in the exercise of power granted to them by the State to abate nuisances, may, under proper circumstances, call upon a court of equity for assistance. (*Metropolitan City Railway Co.* v. *City of Chicago,* 96 Ill. 620; 1 Am. & Eng. Ency. of Law,—2d ed.—73, note 1; 2 Joyce on Injunctions, sec. 1078.) The chief cause of the inadequacy of the remedies at law lies in the fact that the injury is irreparable or will occasion a multiplicity of suits. If there is a substantial dispute as to the fact or law and the question is in doubt, a trial at law will be required before equity will intervene. (1 Pomeroy's Eq. Rem. sec. 542; see, also, Gould on Waters,—3d ed.—sec. 507.) When, however, the existence of a nuisance has been established at law, a court of equity will grant an injunction as a matter of course. (2 Joyce on Injunctions, sec. 1064; 2 Beach on Injunctions, sec. 1064; 1 High on Injunctions,—3d ed.— sec. 741.) "Where the facts are easy of ascertainment and the rights resulting therefrom free from difficulty, equity will grant relief either at the suit of the public or of the citizen." (*Green* v. *Oakes,* 17 Ill. 249.) "A court of equity will, under some circumstances, grant an injunction to restrain the erection of a nuisance, but with great caution. This is always so where there is a remedy at law, until the right has been established by a verdict; and a court will always act with reluctance in abating a nuisance, and seldom, if ever, until it has been regularly found to be such by a jury." (*Dunning* v. *City of Aurora,* 40 Ill. 481;

see to the same effect, *Town of Lake View* v. *Letz,* 44 Ill. 81; *Thornton* v. *Roll,* 118 id. 350; *Nelson* v. *Milligan,* 151 id. 462.) Wherever the legal right is clearly established and the unreasonable and unlawful use of property to the injury of others is clearly proved, it is not necessary that the question should be first determined in a suit at law. (*Wente* v. *Commonwealth Fuel Co.* 232 Ill. 526; *Oehler* v. *Levy,* 234 id. 595.) "In a general way it may be said that the court might properly decline to exercise its equitable jurisdiction where public officials are discharging their duties in the enforcement of the laws and the ordinary methods are effective in compelling obedience to statutes forbidding the creation and maintenance of nuisances, but if ordinary methods are ineffective or officials disregard their duties and refuse to perform them, the court ought to apply the strong and efficient hand of equity and uproot the evil. The remedy should be confined within legitimate bounds." (*Stead* v. *Fortner,* 255 Ill. 468.) The general rule formerly strictly enforced was, that a court of equity would not interfere to restrain a nuisance unless the right so to do was first established in a court of law; but this rule has been somewhat relaxed in modern times, and when the case is clear, so as to be free from substantial doubt as to the right to relief, or it is evident that a nuisance *per se* exists, equitable relief may be granted without first resorting to an action at law. (*Village of Dwight* v. *Hayes,* 150 Ill. 273; 1 High on Injunctions,—3d ed.—sec. 748; 2 Joyce on Injunctions, sec. 1064; 29 Cyc. 1230.) As illustrating these principles, this court has granted injunctions restraining or abating nuisances in the following among other cases: *Wahle* v. *Reinbach,* 76 Ill. 322; *Dierks* v. *Commissioners of Highways,* 142 id. 197; *Smith* v. *McDowell,* 148 id. 51; *Barrett* v. *Mt. Greenwood Cemetery Ass'n,* 159 id. 385; *Oehler* v. *Levy, supra;* and has refused them in the following among other cases: *Dunning* v. *City of Aurora, supra; Oswald* v. *Wolf,* 129 Ill. 200; *Robb* v.

*Village of LaGrange,* 158 id. 21; *Crane* v. *Village of Roselle,* 236 id. 97.

Counsel for appellee contend that the obstruction of Walnut and Front streets is a nuisance *per se,* and on this account, alone, a court of equity was authorized to interfere. This does not necessarily follow. A party may by his own *laches,* where the alleged nuisance has been going on for several years with his acquiescence, be precluded from having his remedy in equity until the right is established at law; and especially is this true if by the delay the person sought to be enjoined has incurred large expenditures under the reasonable belief that there would be no objection to the carrying on of the business. (2 Beach on Injunctions, secs. 1062, 1063; 2 Wood on Nuisances,— 3d ed.—sec. 785; 1 High on Injunctions,—3d ed.—sec. 786; 1 Am. & Eng. Ency. of Law,—2d ed.—74; 2 Joyce on Injunctions, secs. 1061-1063.) Where a highway has been for a long period abandoned and disused, and where it does not appear that the public will suffer any inconvenience or that the public travel will be prevented or seriously incommoded, the remedy by injunction will not be exercised. (1 High on Injunctions,—3d ed.—sec. 821; 2 Joyce on Injunctions, sec. 1061; 29 Cyc. 1231, and cases cited.) A delay of three years or more has been frequently held to be such *laches* as will preclude a party from relief in equity until he has vindicated his right at law. (*Parker* v. *Winipisiogee Lake Cotton Co.* 2 Black, 545.) An injunction to stop chemical works, applied for after the works had been in operation three and a half years, by an individual who owned and resided upon adjoining lands during that time, was denied. (*Tichenor* v. *Wilson,* 8 N. J. Eq. 197.) It has also been held that such a vigorous and speedy remedy as an abatement by injunction will not apply to a mill dam which has been in existence for over half a century. (2 Wood on Nuisances, sec. 785, note 1.) Manifestly, under the facts in this case no such pressing necessity exists

for the removal of the slack from Front and Walnut streets as would require the interference of a court of equity by an injunction.

It is to be noted ·in this connection that the evidence clearly shows that the buildings of appellant are partly situated on Front and Walnut streets as originally platted, and yet neither the bill nor the decree asks or requires any change in these buildings. If there were such a pressing demand for the opening of these streets for public travel as would justify the interference of a court of equity, then surely these buildings ought to be removed as well as the pile of slack.

The same rule of law applies in some measure to the other allegation, as to nuisance on account of disagreeable gases, smoke and odors. It has been held that where a factory alleged to emit cinders from its smokestack has been operated in the same manner for seven years without complaint, a very clear and positive showing of the nuisance is necessary to authorize an injunction. ( *Louisville Coffin Co.* v. *Warren,* 70 Ky. 400.) Where it is sought to restrain, by injunction, the prosecution of a business or vocation, lawful in itself, on the ground that it is obnoxious to the health, comfort or convenience of the neighborhood by reason of disagreeable noises, offensive odors, noxious gases and the like, no general rule can be laid down sufficiently specific and certain to apply to all cases but each case must be decided upon its own peculiar facts, the whole question being one largely of degree, to be determined in the light of human experience. (2 Wood on Nuisances, sec. 801, and cases cited.) The business of appellant is not a nuisance *per se.* If it is so offensive as to materially interfere with ordinary physical comfort, measured, not by the standard of persons of delicate sensibilities and fastidious habits, but by the habits and feelings of ordinary people, then a remedy by injunction may be granted. (*Wahle*

v. *Reinbach, supra; Wente* v. *Commonwealth Fuel Co. supra.*)    What constitutes a nuisance in one locality may not in another.    The damage, to constitute a nuisance, must be real and not fanciful.    The mere annoyance to morbid tastes or excited imagination is not sufficient.    (*Bohan* v. *Point Jervis Gas Light Co.* 9 L. R. A. 711, and note; 2 Beach on Injunctions, sec. 1098; Joyce on Nuisances, sec. 162.)    But carrying on an offensive trade for twenty years in a place remote from buildings and public roads does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood.    *Board of Health* v. *Lederer,* 52 N. J. Eq. 675; *People* v. *Detroit White Lead Works,* 9 L. R. A. 722.

As to the effect of the odors and smells that were alleged to arise from the slack piles there was a decided conflict of evidence.    Some of the witnesses described these odors and gas as "bad," "nauseating," "sickening," and one witness for appellee claimed that they made him sick.    Two or three other witnesses testified that on certain occasions they had found it necessary to close their windows on account of these odors and gases.    Two doctors also testified for appellee that they thought such odors had a deleterious effect on the health by causing catarrhal troubles, tonsilitis and bronchitis, but both of them said they did not know that the health was in that regard any different in that part of the city than in other sections of Pana, although one of them had one case under consideration where he thought the condition had been aggravated by the gases and odors from these slack piles.    Some sixteen or eighteen witnesses testified who showed thorough familiarity with the premises covering a period of years, and most of them stated that it was difficult to determine from what peculiar source the odors in that vicinity came.    Many of these witnesses worked on the premises, or lived, or had lived, close by. They all testified they had not been inconvenienced or an-

noyed, and that they had not suffered in their health, by reason of any odors or gases coming from the appellant's premises. One of them testified that he had asthma and had worked around this slack pile a good deal, but he did not see that it had especially troubled him. At the outside there were not more than five or six witnesses who testified to any annoyance or inconvenience resulting from the odors and gases from these piles of slack.

In view of all the facts here, we think it is clear that the appellee was not entitled to a mandatory injunction to remove the slack either from Walnut or Front street as originally platted or from appellant's land on block 15. No such pressing necessity existed as required the interference of a court of equity.

The condition of the drains in the open ditches in Walnut and State streets north of the Baltimore and Ohio right of way was not such, in our judgment, as to justify, on account of the public health, the interference of a court of equity in attempting to abate that condition, so far as it was caused by appellant, by writ of injunction. As we have stated, we think the manifest weight of the testimony is, that very little, if any, of the water coming from appellant's property got into these two open ditches. Some of appellee's witnesses stated that they could not see that the ditches on these streets north of the Baltimore and Ohio railroad were in an unusual condition. Pond 1, located at the north-east end of the slack piles, was filled, as the evidence tends strongly to show, by surface water, which many witnesses said flowed naturally in that direction. Most of the water used by appellant in its business flowed into pond 2, and the water thrown upon the slack piles to suppress the burning was largely, if not entirely, according to the testimony, absorbed by those piles. The only water (other than natural surface water) from the premises of appellant which could reach pond 1 was that

dripping from the loaded coal cars, and this amount was shown to be very small. The condition there had existed for years.

There can be no question that the water flowing through ponds or settling basins 2, 3 and 4 from appellant's works when they were in operation carried sediment finally from pond 3 into the ditch or natural outlet north into Clay street. There is no certain evidence that the seepage from any of these settling ponds caused any injury to the health of any individual in the community. No witness testified that his health had been injured because of the deleterious effect of the seepage from any of these settling basins or other outlets. The drain into which the settling basins emptied their waters was a natural outlet for this part of the city, and the weight of the evidence showed that the natural drainage from Walnut street west would be through that outlet. There was considerable evidence tending to show that the natural slope for a block east of that street was towards the west. The evidence in this record does not disclose that the city was becoming more thickly populated in the vicinity of appellant's works than when they were first erected or that the buildings were less remote than they had been in years past. On the contrary, the evidence tended to show that this section between the railroads had formerly been a residence district, and that all of these residences had been torn down and removed at the time of this litigation. The evidence also tends strongly to show that all about this neighborhood the streets were originally made from cinders, sand and slack, and that a large quantity of slack, sulphur rock and other materials of like nature was scattered over the ground. Necessarily this would cause the surface drains in that vicinity to be filled with dirty water.

In determining the question of a nuisance, the question of time, location and all the circumstances should be taken

into consideration. The general rule is, that people who live in cities must submit to the annoyance of city life, where smells and odors are complained of as nuisances. In this class of cases an amount of gas or odor which by reason of the density of the population, the residential character of the neighborhood or otherwise might amount to a nuisance in one locality, under different circumstances in another locality might be entirely proper and unobjectionable. (Joyce on Nuisances, sec. 165.)

The existence of a nuisance not having been established by an action at law before bringing this suit in chancery, under all the authorities the facts must be clearly established and the law be without question before an injunction will issue. No such strong or exceptional case of such pressing necessity as would justify the interference of a court of equity exists here.

What is said in this opinion is not intended to control in the trial of any common law case in which any of these questions may be litigated. The record shows that such suits at law have been instituted and are now in the circuit court by appeal. He who seeks an injunction against a nuisance is not regarded as having sufficiently established his rights at law by obtaining a judgment, if the action upon which judgment was recovered is still pending on appeal. (1 High on Injunctions,—3d ed.—sec. 741.)

The decree of the city court of Pana will be reversed and the cause remanded, with directions to dismiss the bill without prejudice.

*Reversed and remanded, with directions.*

Mr. JUSTICE FARMER, dissenting.