(No. 27403.—

DEWARD H. GARDNER *et al.,* Appellants. *vs.* INTERNATIONAL SHOE COMPANY, Appellee.

*Opinion filed March 21, 1944—Rehearing denied May 11, 1944.*

WHITNEL, BROWNING, LISTEMAN & WALKER, of East St. Louis, and MANUEL M. WISEMAN, of Alton, for appellants.

CHAPMAN & THOMAS, of Alton, RICHARD O. RUMER, of St. Louis, Mo., CHARLES E. RENDLEN, of Hannibal, Mo., and BAKER, LESEMANN, KAGY & WAGNER, of East St. Louis, for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

Deward H. Gardner and wife, owners of a house and lot in the village of Hartford, filed a complaint in the circuit court of Madison county against International Shoe Company to recover damages for interfering with the use, occupation and enjoyment of their home because of unwholesome smells and odors produced by the nearby International Shoe Company in the operation of its plant. Eight other owners and their wives joined as parties plaintiff, each alleging the same damage from the same causes, and all cases were tried together, resulting in separate verdicts in favor of the occupants and owners of the nine different premises described in the complaint. Judgments were entered on these verdicts by the circuit court. On appeal to the Appellate Court for the Fourth District the judgments of the circuit court in each case were reversed without remanding. The Appellate Court granted a certificate of importance to this court.

The facts with respect to each plaintiff are, respectively, set forth in nine separate counts. After setting out the ownership of the premises and the nearby location of the defendant's plant it is alleged that defendant operates a factory in which the hides of animals are tanned and cured and leather is produced for shoes and other purposes; that from nine hundred to one thousand persons are employed daily, and that in the operation of the factory the defendant controls and maintains an open sewage pond or pool within the village of Hartford, which contains waste material and chemicals and raw sewage, which is afterwards drained into the river; and that the operation of said pond creates quanties of chemicals, gases, odors, fumes and other unwholesome, noisome, unclean and irritating vapors in the air, which are dependent to a certain extent upon the character of the operation of the factory and atmospheric conditions, and said odors and fumes are unwholesome, irritating, foul smelling, nauseating and deleterious to the health of the public and to plaintiffs in particular, and wrongfully, improperly and unlawfully interferes with the wholesome enjoyment of plaintiffs' premises; that defendant has been requested to abate the nuisance, and has failed to do so, and because of such improper conduct plaintiffs have been disturbed and denied the healthful enjoyment of their homes.

The defendant's answer neither admits nor denies the allegations with respect to plaintiffs' ownership, but admits it is a corporation and as such owns a factory site and has operated it for twenty-three years, that in such plant hides of animals are cured and tanned for the purpose of making leather, and that it employes approximately nine hundred to one thousand persons; admits that in connection with the operation of the factory it owns and controls a pond, into which waste material is emptied, which contains some chemicals and some sewage; alleges that the chemical content of affluent emptied into the pond is so

slight as to make it almost imperceptible, that a small amount of sewage from cafeteria and toilets is drained into the pool, which is ninety-five per cent water that has been used to wash hides to remove foreign substances, and that such substances are taken up by screens, leaving a slight amount of organic matter in the water which goes into the pond, that the maintenance and operation of the pond are necessary to the tannery, and that same was built at large expense under conditions and restrictions imposed by the Sanitary Water Board of the State of Illinois. It denies that, in the operation of the factory, the matter going into the pond causes gases, odors, fumes, or other unwholesome and irritating matter in the air so as to deprive plaintiffs of the wholesome enjoyment of their homes; admits that some odors arise from the operation of the tannery and the pond, but which are only usual, ordinary and incident to the tannery, and that such odors and smells are not harmful, deleterious, unwholesome, noisome, unclean, irritating or detrimental to health, and that the factory was at its location long before the homes of the plaintiffs were built, and that such homes were located with full knowledge of the odors peculiar to the tannery of the defendant.

The answer further alleges that the factory and pond are in an industrial community, and in the same district are located a large number of factories and manufacturing plants, including oil, fertilizer and refining, and each in its turn emits odors peculiar to its business, and that whatever odors are noticeable are slight and only incidental to the life in an industrial community. The answer then describes the location of the pond, alleges that it was located and built by order of the Sanitary Board of the State of Illinois, and that such odors as arise, if any, are not such as would entitle the plaintiffs to recover. A reply was filed by the plaintiffs in which they denied every matter of defense set out in the answer.

Thus it appears the pleadings consist of a complaint in which it is alleged foul odors caused by the improper operation of the defendant's plant deprive the plaintiffs of the wholesome enjoyment of their homes. The answer, in addition to denying improper operation of the plant and the production of the odors in question, affirmatively shows that all of the parties reside in an industrial community in which are various odors consonant with the life of the community, and alleges that this, being the only matter of which plaintiffs complain, is not the subject of damages, because the odors are necessary to industry and are a part of the conditions under which all persons in the community live. Everything in the answer is denied, so the issue on one side is foul odors, and· on the other odors justified as being reasonably necessary to the industrial community in which the plaintiffs reside.

In addition to the plaintiffs, who all testified, were two other residents of Hartford. After describing the location of their various homes, which were from 400 to 700 feet distant from the pool or basin, the principal testimony offered was as to the degree, character and foulness of the smell, which is claimed to emanate from the premises of the defendant. The descriptive words given to these odors depend largely upon the extent of the vocabulary of the witnesses, and their ability to express the effect the odors had upon the enjoyment of their homes. The inference gathered from many of these witnesses is that the pond contained sewage and flesh from hides and other matter causing odor by decay or putrefaction. Various degrees of physical discomfort are narrated, but there is nothing to show that anything of a physical nature was deposited upon the premises, other than the claim that vapors arose from the surface of the pond which would, of course, occur from any large mass of water at different times of the year, when the temperature of the air and the water varies. The claim of these witnesses is that the odor was different

from the tannery smell, which had existed in prior years, and was caused entirely by the matter deposited in the pond.

The testimony of the witnesses for the defendant as to the amount and the noisome nature of the odors is in direct conflict. Twenty residents of the village, most of whom are not in any way connected with the defendant, testified the odor of the pond was substantially the same as the odor emanating from the tannery before the construction of the pond, and that it was not foul, offensive, or deleterious to health. In addition to the resident witnesses a sanitary engineer, a doctor from the Hygienic Department of the State of Illinois, and an officer of the labor organization to which the workers in the defendant's factory belonged, also testified.

The evidence shows the defendant's plant is operated in the usual and customary manner of tanneries; that it prepares hides for leather to be used in shoes; that a very large quantity of water was used in this process, both before the pond was established in 1938 and since that time. Measurements were made by the sanitary engineer before and after the building of the pool or basin of the constituents of the waste products. After the pool was constructed 1,341,000 gallons of water and waste flowed into and through the pool daily. This contained on the average 9480 pounds of suspended solids; 57 per cent of these solids were inorganic, consisting principally of lime. This would leave approximately 4000 pounds of organic matter which would be suspended in over 10,000,000 pounds of water, or an average of about one pound of organic matter to eight or nine barrels of water. The sewage matter coming from toilets included in this organic matter was about one pound to every 200,000 pounds of water. The pool was 1200 feet long and 275 feet wide, and the flow from the outlet end was the same as that which came in, so, to a certain extent, the water was moving slowly all of the time.

The principal use of the water was to wash the hides. They were washed eight times; the first for the purpose of taking off the loose dirt and salt; the second for the purpose of softening the hides; the third for the purpose of giving the chemical treatment to loosen the hair; the fourth and fifth for the purpose of washing out the lime they may have absorbed; the sixth for a treatment of salt and sulfuric acid, and the others for a treatment which produced the tanning. The hair was removed by machinery. The matters taken from the hides did not flow directly into the pool, but the water went through sieves containing holes from three-sixteenths to a quarter of an inch in diameter, which constantly revolved, and the solid matter was scraped off by machinery, and this did not enter the pool. During the process in which the water goes over the hides approximately five tons of slaked lime per day is placed in the water, about half of which remains in suspension in the pond.

The pond itself was built at the direction of the Sanitary Board of Illinois, and its engineer and hygienic director both testified. The latter was a licensed physician. The odors at the pond were measured by an instrument designed for that purpose. The doctor testified there was nothing deleterious or injurious to the health, and also that the odors emanating from the pond were substantially the same as the odors emanating from the tannery itself. The operation of the plant is shown to be modern and up-to-date, and in accordance with the best practices in such line of business. There is no question but that an odor does originate in the process of tanning hides, and that it was impossible to tan hides without this odor; but defendant's evidence shows that it is not injurious to health, or of a foul and unwholesome character.

The defendant's evidence also shows there are many industries located in and near the village of Hartford; that there are several oil refineries, a rendering plant, and nearby

railroads; and it is clear beyond question that the whole community is a part of a large industrial section in the neighborhood of St. Louis and East St. Louis. It is also disclosed there are some sixteen or eighteen hoghouses located on different premises in the village of Hartford, four of which are in the neighborhood of the plaintiffs' residences.

While substantially all of the testimony of plaintiffs comes from the complaining owners, outside of the expert's testimony, the testimony of the defendant consists of residents of the village, including the principal of the public schools, the mayor, the school nurse, grocers, real estate dealers, health officer, town supervisor, lumber dealer, operators of cafes, stores and other local businesses, all of whom testified they were familiar with the odors, and that they were neither harmful nor in degree anything comparable to that claimed by plaintiffs. Under the pleading all of the matters complained of, except ownership and location of plaintiffs' properties, are denied in the main by disinterested witnesses; and all of the affirmative matters set forth in defendant's answer proved and not disputed, or even attempted to be refuted by the plaintiffs.

Under this state of facts the Appellate Court had not only to determine whether the odors coming from the defendant's factory were sufficient to justify a judgment for plaintiffs, but also to consider the proof of additional facts which were claimed to operate as a defense. The plaintiffs did not raise any question of the validity of this defense as set forth in the answer, but on the other hand contented themselves with denying everything alleged therein, offering no proof to refute what was set forth in the answer.

Where a motion to dismiss is made both at the close of the plaintiff's case and at the close of all the evidence, the Appellate Court is required to examine all of the evidence, not merely that offered on the part of the plaintiff. (*Gold-berg* v. *Capitol Freight Lines,* 382 Ill. 283; *Dixon* v.

*Smith-Wallace Shoe Co.* 283 Ill. 234.) The Appellate Court having determined from all of the evidence that the plaintiffs were not entitled to recover, it is fair to assume that it gave certain effect to the undisputed testimony offered by the defendant, since it is set forth in considerable detail in the opinion.

The principal point arising in this case is whether a plaintiff can recover for any odor that comes from a manufacturing plant that disturbs him in the enjoyment of his premises, or whether such enjoyment is limited to any extent by his living in the neighborhood of an industrial community where various smells, odors, gases and vapors are absolutely necessary to the carrying on of the business of producing articles of commerce or use for the public generally. This is a matter which has received considerable consideration by the courts, not however, with complete uniformity of result.

Cooley on Torts, (4th ed.) vol. 3, p. 163, after reviewing a great many authorities, comments upon nuisance causing personal discomfort, as follows: "Where the complaint is that something done or suffered by the defendant causes personal discomfort to the plaintiff, it is seldom that the controversy is confined to the single point of personal annoyance, and it will generally be found to embrace considerations of what is a reasonable use of the property of the parties, respectively, and what discomforts and inconveniences one can reasonably be required to submit to and endure for the convenience and benefit of his neighbor. If a discomfort were wantonly caused from malice or wickedness, a slight degree of inconvenience might be sufficient to render it actionable; but if it were to result from pursuing a useful employment in a way which, but for the discomfort of others, would be reasonable and lawful, it is perceived that the position of both parties must be regarded, and that what would have been found wholly un-

reasonable before may be found as clearly justified by the circumstances now."

We have said there is no general rule applicable to all cases for determining when offensive odors constitute a nuisance, but each case must be decided upon its own peculiar facts, taking into consideration all of the surrounding circumstances. (*City of Pana* v. *Central Washed Coal Co.* 260 Ill. 111.) In the cited case the alleged nuisance consisted of the continuous burning of a pile of slack or refuse from a coal mine, which consisted of a mound some 70 or 80 feet high, and contained several thousand tons, and from it was constantly being emitted a dense smoke, permeated with sulfurous fumes and other disagreeable odors, which it was claimed interfered not only with the enjoyment of the nearby homes, but was also unhealthful in character. After a review of the evidence we said: "In determining the question of a nuisance, the question of time, location and all the circumstances should be taken into consideration. The general rule is, that people who live in cities must submit to the annoyance of city life, where smells and odors are complained of as nuisances. In this class of cases an amount of gas or odor which by reason of the density of the population, the residential character of the neighborhood or otherwise might amount to a nuisance in one locality, under different circumstances in another locality might be entirely proper and unobjectionable."

In *Cooper* v. *Randall,* 59 Ill. 317, where damages were claimed because a flour mill cast chaff, dust, dirt and other impurities into the plaintiff's house, the court said: "We all know there are many annoyances, inconveniences, and interruptions incident to the enjoyment of property in a state of society for which the law does not and cannot give compensation. Persons residing in a city or near a public highway are liable to inconvenience, annoyance, and

interruption in the enjoyment of their property, from the noise and dust produced from travel over streets and highways, and yet for these no one thinks of suing the person using the way for damages. So of manufactories, machine shops and the like. They may necessarily produce annoyances and interruptions to those in the immediate vicinity by the noise of machinery or the collection of persons at these places, and still those suffering the inconvenience have no right to recover damages."

In *Lambeau* v. *Lewinski,* 47 Ill. App. 656, in which a tannery was claimed to be a public nuisance, the court said: "The evidence shows to our minds that the tannery is conducted in a skillful manner and with as little offense and damage to the neighborhood in general and to the appellee in particular, as is consistent with the nature of the business and known appliances. To subject the appellants to the payment of large damages for using their property in a way which, in the nature of things, must be continuing and will be recurring, in a greater or less degree, every day the tannery remains in operation, will, necessarily, result in the destruction of appellant's business, an event which should not be encouraged upon any such showing as the evidence in this case discloses." In this case, as here, the defendant was located in a business neighborhood, close to railroad tracks and highly industrialized.

Many courts from other jurisdictions have reached the same conclusion. Thus in Ohio it is said: "All that can be required of men who engage in lawful business is that they shall regard the fitness of the locality. In the residence sections of a city, business of no kind is desirable or welcome. On the other hand, one who becomes a resident of a trading or manufacturing neighborhood, or who remains while, in the march of events, a residence district gradually becomes a trading or manufacturing neighborhood, should be held bound to submit to the ordinary annoyances, discomforts, and injuries which are fairly inci-

dental to the reasonable and general conduct of such business in his chosen neighborhood. The true rule would be that any discomfort or injury beyond this would be actionable; anything up to that point would not be actionable." *Eller* v. *Koehler*, 68 Ohio St. 51, 67 N. E. 89.

In *Higgins* v. *Decorah Produce Co.* 214 Iowa, 276, 242 N. W. 109, involving odors and smells coming from a poultry and produce plant, which were described by the plaintiff as equally offensive as in the present case, the court said: "Every property owner or person has the right to have the air diffused over his premises in its natural state and without being unduly impregnated with foreign substances such as smoke, soot, noisome fumes, and other offensive matters, but air in congested centers of population is seldom absolutely pure and cannot reasonably be expected to be. In every city smoke, soot and more or less offensive odors and noises calculated to disturb and interfere with the comfort of residents are present and cannot be avoided. The air in such circumstances is more or less necessarily impregnated with foreign substances. Residents and property owners must therefore endure without the right of legal recourse, annoyances and discomforts incident to urban life."

The decisions of other courts are substantially to the same effect: *Ebur* v. *Alloy Metal Wire Co.* 304 Pa. 177, 155 Atl. 280; *Dixie Ice Cream Co.* v. *Blackwell*, 217 Ala. 330, 116 So. 348; *Prest* v. *Ross*, 245 Mass. 34, 139 N. E. 792; *Strachan* v. *Beacon Oil Co.* 251 Mass. 479, 146 N. E. 787;; *Clark* v. *Wambold*, 165 Wis. 70, 160 N. W. 1039; *Thompson* v. *Elzy*, 83 Ind. App. 215, 148 N. E. 154. The principle to be derived from these authorities is that the unlimited and undisturbed enjoyment which one is entitled to have of his own property must be qualified to this extent, that trifling inconveniences resulting from the useful employment of a neighbor's property must be submitted to when what is complained of arises from and is suitable

to the locality and when the employment of one's premises under the circumstances is reasonable.

The plaintiffs concede that persons living in industrial communities must suffer without remedy any uncomfortable odors which are ordinarily and necessarily prevalent therein; and also concede that the village of Hartford is a highly industrialized community. Their contention, however, is that the settling basin or pool is not a part of the tannery plant, and that it makes no difference whether the odor was or was not the same as that which came from the tannery before the location and construction of the pool outside of the tannery, but constitutes a separate nuisance in itself. We cannot accede to this theory. Before the construction of the pool the waste products were carried directly from the plant to the river. It was necessary to use a million and a quarter gallons of water each day to get rid of the same, and the administrative department of the State of Illinois required this be changed. It was equally impossible to dispose of the water inside of the plant, or to locate therein a pool containing the dimensions required for the purpose. It was carrying on the operations of the tannery plant in another manner, which met the requirements of the Sanitary Board of the State of Illinois. It is a modern and up-to-date method of handling such waste products.

There is no proof there was anything improper about the location or construction of the pool as alleged in the complaint other than that an odor emanated from it. It is conceded that a like or similar odor, perhaps of less intensity, came from the tannery itself; that it was commingled with odors from oil refineries, rendering and fertilizer plants, lead smelters, smoke from railroad facilities, and other commercial enterprises. It is difficult to understand how it could be in a different category from that of the tannery itself, except possibly as an unsightly view, which is not claimed as an element of damages in this

case. The evidence of the defendant relating to the pool as a part of the tannery is not disputed in any way. It is not claimed it is not a part of the tannery, and it was considered by the Appellate Court as a part thereof.

If the motion made by the defendant at the close of the plaintiffs' evidence had been allowed by the court then the rule suggested by appellants, that the effect of the evidence most favorable to the plaintiffs should be followed, would be applicable. However, when the affirmative defense was made and a motion offered, at the close of the evidence, for a directed verdict, the Appellate Court on review had a right to consider all of the evidence in determining whether the plaintiffs were entitled to recover. (*Dixon* v. *Smith-Wallace Shoe Co.* 283 Ill. 234; *Goldberg* v. *Capitol Freight Lines,* 382 Ill. 283.) In doing so it necessarily considered the use of the premises in an industrialized community operated in the most modern manner, in accordance with the best standards, and applied the rule announced above.

An illustration of where a similar situation could arise upon issues and proof would be the case of a suit on a note, with an affirmative defense of payment. In the first instance the note would prove the plaintiff's case, and, if nothing further were offered, only that evidence could be considered, but when proof of payment is made without rebuttal, then if the court should find that payment had been made, the proof made by the production of the note would be overcome and rendered ineffective by the proof of the affirmative defense. That, in our judgment, is the situation which presents itself in this case.

The evidence introduced by the plaintiffs was vigorously disputed. It was shown that in the same community stores and cafes, public institutions, etc. are in operation without complaint; that nearly four hundred children attend school within 400 feet of the alleged nuisance; that the school officials, city officials and town officials, all of

whom certainly would be interested, were the conditions such as are described by plaintiffs, testify there was substantially no change in conditions between the odors emanating before and after the building of the pool, and that no serious inconvenience has resulted to any one.

The Appellate Court has power to pass upon all of the facts considered in relation to the rule which permits reasonable odors to emanate from a business as a part of an industrial community, and also to determine whether the plaintiffs, as members of such community, have established an unreasonable disturbance in their right and privilege to enjoy their homes.

· Appellants have cited a number of authorities which in general apply to cases where there is some physical disturbance of the plaintiff's premises in the way of dust, cinders and the like; or cases in which the alleged nuisance was in addition to, or in excess of, the general nature of the defendant's business; or in cases in which the locality was not industrialized by manufacturing or business interests. These cases have all been analyzed and, in our judgment, correctly interpreted by the majority opinion of the Appellate Court, and need no further comment.

It is also claimed that the Appellate Court undertook to weigh the evidence applying to the cause, and therefore exceeded its powers. Such, however, does not appear to be the fact. The opinion discloses the court considered none of the errors assigned by the defendant except the one that there should have been judgment rendered in its favor, notwithstanding the verdict.

It appears from the complaint, and also from the plaintiffs' evidence that plaintiffs lived in an industrial neighborhood and that the pool was only a part of the plant. But there was no proof of injury to the health of any of the plaintiffs, or that the plant or pool in connection therewith were improperly operated, or that the odors complained of were not reasonably necessary, considering the

neighborhood. In addition the defendant, without contradiction, established the additional facts relating to the location and manner of operation, and the commercial character of the neighborhood, which was clearly relevant in determining plaintiffs' right to recover. The Appellate Court has a right to determine whether a case has been made, entitling the plaintiff to recover, and to reverse a cause without remanding where no ground of recovery has been shown. (*Taylor* v. *City of Berwyn*, 372 Ill. 124; *Darmody* v. *Kroger Grocery and Baking Co*. 362 Ill. 554.) The effect of the holding of the Appellate Court is that, considering all the evidence, there was not sufficient to sustain a verdict for plaintiffs.

After an examination of the evidence and the law applicable thereto, and the opinion of the Appellate Court, we are unable to say that the judgment of the Appellate Court, as a matter of law, was erroneous. Its judgment is therefore affirmed. *Judgment affirmed.*