Mabel Ward et al., Plaintiffs-Appellees, v. Illiopolis Food Lockers, Inc., Defendant-Appellant.

Gen. No. 10,035.

Third District.

February 23, 1956.

Released for publication March 12, 1956.

William P. Roberts, of Illiopolis, and Drach and Horwath, of Springfield, for defendant-appellant.

Pree and Pree, of Springfield, for plaintiffs-appellees.

JUDGE REYNOLDS delivered the opinion of the court.

The defendant in this case operated a slaughter-house, food locker and meat market in the Village of Illiopolis, Illinois. It had been in business at the same location for about 14 years. The locker and slaughter-house are located in a semi-commercial part of the village. Complaint was filed by 25 residents of the village asking for an injunction to restrain the defendant from killing cattle and hogs within the village limits, and for damages. The complaint charged the business of the defendant was a common nuisance, and that as so operated it was offensive to the neighborhood because of the noise, the offensive odors, and that it impaired the health and comfort of the plaintiffs and the citizens generally; that the quiet, peace, health and comfort of the plaintiffs and the citizens of the village had been interfered with and that they

were deprived of the comfort and enjoyment of their properties, and that the operation of the slaughterhouse had affected adversely the salability and value of their property.

The court ordered an injunction to issue against the defendant, after 90 days from the date of the order, but allowed no damages. From that order the defendant appeals to this court.

An examination of the record shows that the evidence was conflicting. Several witnesses testified that they saw animals killed in the rear of the locker, and that before the building was built, this was done quite openly, mostly by shooting the animals in the trucks that brought them to the slaughterhouse, and then removing the bodies into the dressing tent or room. That the animals especially the cattle would bawl from time to time, and that sometimes the trucks would wait there for one or one and one-half hours before they were killed. The shooting was done with a 22 rifle. Some two or three years before the suit, on recommendation of a State Inspector, a building was built and thereafter nearly all the killing was done inside. These same witnesses testified they could hear the shots after the building was built. Nearly all of the witnesses for the plaintiff complained of the offensive odors and smells, and the noise. Some of them testified that there were numerous flies about the establishment. Some of these witnesses lived quite close to the slaughterhouse, especially A. T. Ward and his wife, but others lived some two or three blocks away, and had passed the slaughterhouse from time to time. Opposed to this testimony there were several witnesses for the defendant who stated that there was no odor, other than a market or meat odor, that the noise did not bother them or that they had not heard any noise, and that they had not observed any flies.

The operators of the slaughterhouse testified that they observed all laws and rules regarding sanitation

131

and cleanliness in the operation of their business; that there was no great noise; that there was no odor other than the meat odor, and that there were no flies; that they killed about 100 cattle a year and about the same number of hogs; that the bulk of their slaughtering was done in the months of January, February and March; that in the summer months they slaughtered once a week; that they used insecticide everywhere necessary; that they used the coagulation method on the blood and this was placed in containers and picked up promptly by a rendering concern. The Mayor of the village testified that he had inspected the plant numerous times because of complaints, and found nothing wrong. A representative of the Illinois Department of Agriculture testified that as part of his duties he inspected the plant of the defendant several times and found that each time it met the requirements of the sanitary law. Arthur M. Nelson, a former meat inspector for the United States and afterwards as an inspector for the State of Illinois, testified that he visited the slaughter house of the defendant two or three times, and that he at the first visit made certain recommendations which he found on his next visit were carried out by the defendant. Mr. Nelson stated that the plant of the defendant was better than average as to sanitary conditions. The ordinance of the Village of Illiopolis under which the plant of the defendant operated was introduced in evidence.

■ ■ It must be conceded that the operation of the business of the defendant was neither a public nuisance nor a nuisance per se. If a public nuisance it would be necessary that the suit be brought in the name of the public, and certainly the operation of a slaughterhouse under certain conditions is not a nuisance per se in Illinois. The slaughtering of animals for food is a legitimate business and must necessarily be carried on in the vicinity of each city or town the

inhabitants of which need to be supplied with meat, and consequently cannot be claimed per se to be a public or private nuisance unless established so near a center of population or a private dwelling as necessarily and unavoidably to hurt and annoy the public or invade and do damage to private vested rights of an individual, Am. Jur. Vol. 48, page 463. In this case, Illiopolis is a small village in the County of Sangamon. The testimony shows that a large segment of its population is that of retired farmers. There is no clear showing that the establishment of the defendant was in such a closely built up section of the village as to render its operation a public nuisance. In fact, the evidence shows that while the area had some private dwellings, it also had several business establishments within a short distance of the plant of the defendant. From the evidence this court cannot conclude that the neighborhood was such a residential area that the very nature of the business of the defendant would be offensive. On the contrary the evidence shows that the business of the defendant had been operated without very much complaint at the same location for several years.

The grounds relied on by the plaintiffs for an injunction were the noises of the animals left in the trucks, their bawling and crying, the presence of offensive odors and smells, the excessive number of flies, and the depreciation of the value of their properties. The plaintiffs claimed that these alleged conditions constituted a nuisance and affected adversely the health, property, welfare and well-being of the people of the community and of the plaintiffs.

The testimony as to the noise of the animals is very inconclusive. It was testified by three or four witnesses that the noise of the animals held in the trucks in the rear of the locker plant annoyed them. That the animals would bawl, although they limited the bawling to once or twice an hour. Animals cooped up

in a truck are naturally frightened and uncomfortable and they will bawl. But unless this bawling was continuous and to such an extent that the whole neighborhood was annoyed and disturbed, it would seem to this court that such noises are the same noises they would obtain in any area where cattle are hauled or kept. To say that this constituted a nuisance would be going far indeed. The testimony as to excessive noise of the animals in the trucks is fairly well confined to the testimony of A. T. Ward, his wife, Mabel Irene Ward, his brother-in-law Sam Headrick, and his sister-in-law Nell Headrick. Mr. Arthur E. Hunter, one of the witnesses for the plaintiffs testified that the noise of the animals in the trucks was moderate. Others testified that they heard the bawling of the cattle but failed to state if the noise annoyed them or was disturbing in any way.

Some of the plaintiffs claimed there was an excessive amount of flies around the plant. But this was rather definitely contradicted by the testimony of the Mayor, the State Inspector for the State Department of Agriculture, and Mr. Arthur M. Nelson, as well as by Lee Febus, and Dean Febus.

The question as to the depreciation of the value of the properties of the plaintiffs would have to rest upon the testimony of Mr. Isaac Loose, the president of the village bank. Mr. Loose was asked if he had an opinion as to whether or not the presence of the slaughterhouse has and would affect real estate or properties nearby and immediately adjoining. He stated that in his opinion that it would lower the value. Asked if that would be substantial, he replied that he did not know. That he was not able to say how much. This witness testified as to no specific instance and only stated his opinion. Again, this testimony is inconclusive and fails to prove the contention of the plaintiffs that the values of their properties had been adversely affected.

The other ground, offensive odors and smells, was strongly established by the plaintiff witnesses, and just as strongly denied by defendant witnesses. It was admitted that there was some odor, but it was denied that the odors were such that constituted a nuisance. A number of authorities from other jurisdictions are cited in connection with this point, but they are not binding upon this court. However, the law in Illinois on this point was laid down in the case of Gardner v. International Shoe Co., 319 Ill. App. 416, in a very exhaustive and well reasoned decision. That case was affirmed in the case of Gardner v. International Shoe Co., 386 Ill. 418. The Gardner case was a joint suit by eight husbands and wives and one individual to recover damages, charging the International Shoe Company with improper conduct in the operation of its tannery and settling basin in the village of Hartford, Illinois, and alleging as a result of such alleged improper conduct, the defendant shoe company necessarily caused odors which interfered with the plaintiff's use, occupation, and wholesome enjoyment of their respective homes, and caused the plaintiffs substantial damages, peculiar to them. That court reviewed a number of cases in Illinois on the question of nuisance. In that case as in this, the plaintiffs claimed the odors were offensive. In that case the plaintiffs claimed that the offensive odors at times caused nausea and headaches. But the court held that this in itself did not constitute a nuisance. The court in that case quoting from the case of Strachan v. Beacon Oil Co., 251 Mass. 479, said: " 'The defendant is engaged in a lawful business in the conduct of which it is found that odors necessarily will escape into the air; but it also appears that the defendant has adopted the most improved methods and devices to control and confine such odors. . . . It also is further found that such odors would not be unbearable or injurious to the health of normal persons.' " And the court, refer-

135

ring to the same case of Strachan v. Beacon Oil Co., supra, and others cited, said: "These cases discuss principles applicable to the operation of business which unavoidably and reasonably discharge odors and scents. They consider the burdens necessarily incident to life in urban and industrial communities where the air is filled with unpleasant odors which are inevitable and unavoidable in the conduct of factories and industries in such a district, and are a necessary incident of life therein." And in reversing the judgment of the trial court the court said: "To permit the judgment to stand in this case and to countenance recovery in this class of cases, would expose the industrial world to litigation, the extent of which one's imagination toils in vain to comprehend. Conceive, if you can, the thousands of delicate stomachs and sensitive olfactory organs that would be grievously disturbed and offended by odors that are unavoidably induced by stockyards and chemical plants that abound in every metropolitan area."

In affirming the opinion of the Appellate Court, the Supreme Court, in Gardner v. International Shoe Co., 386 Ill. 418, said: "But there was no proof of injury to the health of any of the plaintiffs, or that the plant or pool in connection therewith were improperly operated, or that the odors complained of were not reasonably necessary, considering the neighborhood." And the court, in that case further said: "The principle to be derived from these authorities is that the unlimited and undisturbed enjoyment which one is entitled to have of his own property must be qualified to this extent, that trifling inconveniences resulting from the useful employment of a neighbor's property must be submitted to when what is complained of arises from and is suitable to the locality and when the employment of one's premises under the circumstances is reasonable."

136

■ It is the law in Illinois that the reviewing court will not undertake to substitute its judgment for that of the trial court, unless the verdict or judgment is clearly and palpably against the weight of the evidence. But on the other hand, where the verdict or judgment is clearly and palpably against the weight of the evidence, it is the duty of the reviewing court to interpose its judgment and reverse the judgment of the lower court. Such appears to be the case here.

■ In the instant case, the plaintiffs failed to prove by a clear or greater weight of the evidence, such unreasonable or offensive noises as to constitute a nuisance. They also failed to so prove that there was any danger or threat to health or that any one had so suffered in health by the operation of the plant of the defendants. They proved odors, but in the light of the Gardner v. International Shoe Company cases, their proof of such odors was not such that would justify the court in destroying the business of the defendant by granting the injunction. The testimony of State officials charged with the duty of supervising such establishments so as to safeguard the health of the community and those citizens affected, shows conclusively that the defendant had complied with all sanitary and regulatory measures required by the State. It had improved its plant and taken all proper precautions to reduce noise, odors and promote the safety of its operation. In the opinion of an expert witness, Mr. Nelson, it was "better than average" as to such establishments in Illinois. From an examination of the whole record, and all the evidence, this court must hold that the judgment of the trial court was against the manifest weight of the evidence, in the light of the law in Illinois, was clearly and palpably erroneous, and should be reversed.

Reversed.