The City of Chicago, Plaintiff-Appellant, *v.* Commonwealth Edison Company, Defendant-Appellee.

(No. 59336;

First District (1st Division)—November 27, 1974.

Richard L. Curry, Corporation Counsel, of Chicago (Daniel Pascale, Jerome A. Siegan, and William R. Quinlan, Assistant Corporation Counsel, of counsel), for appellant.

Isham, Lincoln & Beale, of Chicago (Richard E. Powell, C. Richard Johnson, and Christine H. Dykstra, of counsel), for appellee.

Mr. JUSTICE BURKE delivered the opinion of the court:

The City of Chicago appeals from a decree denying injunctive relief sought by the City against the Commonwealth Edison Company. The City attempted to enjoin the operation of Edison's Hammond, Indiana, electric generating facility alleging that the facility was a common law nuisance to the residents of Chicago. After extensive testimony the trial judge found that the evidence was insufficient to establish that the plant constituted a common law nuisance. The court further held that the City's action was an attempt to ask a court under the guise of a common law nuisance doctrine to establish air-pollution standards in an area which is already subject to federal, state and local regulations. It was the trial court's opinion that such matters are best handled by regulatory agencies.

The City alleged in its first complaint filed in September, 1970, and in an amended complaint that emissions from Edison's Indiana station violated city, state and federal regulations and therefore constituted a

statutory public nuisance. The court dismissed both complaints finding that the City could not enforce its ordinances with respect to the Indiana station. The court directed the City to amend solely on the basis of common law nuisance.

On December 1, 1971, the City filed a second amended complaint alleging that coal containing an excess of 3% sulfur by weight was burned at Edison's Indiana plant; that the Indiana facility was within 1 mile of the City of Chicago; that the burning of such coal results in the emission of sulfur dioxide, smoke, particulate matter, dust, fumes and other poisonous gasses constitute a common law nuisance; and that such emissions cause substantial, unreasonable and irreparable injury to the residents of Chicago.

Edison answered by denying that its Indiana station constituted a common law nuisance. Edison alleged that significant expenditures of money had been made in an effort to reduce particulate matter and sulfur dioxide emissions from the Indiana station. It was contended that during 1971, the average sulfur content of the coal burned at the facility was 2.0%, and during the latter half of 1971, 1.66%. Edison further questioned the propriety of an equity court's jurisdiction, alleging that the City had yet to exhaust available legal and administrative remedies.

A trial was conducted and evidence was received on the question of common law nuisance. The trial court ruled that the City had not met its burden in establishing that Edison's Indiana station constituted a nuisance to the residents of Chicago.

On appeal, the City contended that the trial court's finding was in error. Edison responded with the argument that the finding was not against the manifest weight of the evidence presented at trial. Edison further argued that the City is not authorized to bring suits to abate alleged nuisances originating in other states. We agree with the trial court's determination that the evidence is insufficient to establish that the Indiana facility constitutes a common law nuisance. Because the trial court's decision on the merits is completely supported by the record, we need not address the question of the City's authority to maintain this type of action.

The City initiated its case at trial with testimony from City "smoke inspectors." These five witnesses were trained to observe smoke and classify the density of smoke by the use of the Ringelmann Chart.[1]

---

[1] The Ringelmann test referred to is described as follows in the Rules and Regulations of the Illinois Environmental Protection Agency Governing the Control of Air Pollution: "RINGELMANN CHART—The chart published and described in the Bureau of Mines, U. S. Department of Interior, Information Circular 8333 or as revised, and on which are illustrated graduated shades of gray to black for use in estimating the apparent density of smoke."

Numerous smoke observations were recorded by these inspectors measuring plumes from the stacks at the Edison facility to have an opacity between 60% and 80%. One of the inspectors who resides 1½ miles from the Indiana station testified that "when the wind blows to the east" (towards Chicago), he could smell coal in the air and could see a gritty substance on cars and homes.

Upon cross-examination, it was revealed that water vapor in combination with particulate matter affects the density of the plume emitted. None of the smoke inspectors had made an effort to determine whether or not the plumes observed contained water vapor.

Dr. Paul Harrison, assistant director of technical services, Department of Environmental Control, City of Chicago, testified for the City as to the nature of the emissions originating at the Edison plant. Dr. Harrison began by offering a set of computations which purported to show the total number of tons of sulfur dioxide and particulate matter discharged from the station. Using these total discharge computations as a base, Dr. Harrison attempted to demonstrate the total amount of ground level concentrations contributed to the Chicago area under specific assumed wind and stability conditions. He did not employ the aid of a computer in his calculations.

Dr. Harrison's figures as to the total amount of particulate matter discharged by the station were developed by multiplying the percentage of fly ash content of the coal at the station by the total amount of tons burned. That result was then multiplied by the efficiencies of the station's pollution control equipment as shown in selected tests conducted and published by Edison. Dr. Harrison concluded that about 3½ tons of particulate is discharged by the plant each month. Postulating that the wind blows over Chicago 33% of the time from the Indiana plant, Dr. Harrison stated that over one-half million pounds of particulate matter blew over the Chicago area each month.

To obtain the total amount of sulfur dioxide emissions discharged, Dr. Harrison multiplied the total tons of coal burned by the percentage of sulfur dioxide reflected in reports of various stack tests conducted by Edison. The average percentage of sulfur content used by Dr. Harrison was 2.5%. He stated that the total output of sulfur dioxide emissions from the Edison facility was approximately 15 million tons each month; 5 million pounds blowing over the Chicago area.

The testimony and exhibits at trial indicate that the data reflecting the total weight of emissions discharged from the stacks has in itself little significance except to form a basis for computing ground level concentrations. Dr. Harrison stated that suspended particulate matter concentrations from the Edison plant in the Chicago area is approximately

6,000 micrograms per cubic meter under the most turbulent conditions and a low wind speed. Under those same turbulent conditions with low winds, Dr. Harrison estimated that sulfur dioxide concentrations from the Edison plant could be as high as 57,155 micrograms per cubic meter at a distance .4 miles from the station.

Dr. Harrison attempted to compare his figures with the current federal standards in order to illustrate the impact of these concentrations on the health of Chicago residents.[2] He did not, however, testify to any specific medical consequences of the concentrations estimated to be originating at the Edison plant.

Cross-examination revealed several assumptions and methodological errors which had the effect of exaggerating several of Dr. Harrison's estimations. Dr. Harrison testified that he assumed that all of the fly ash in the coal left the boilers and went to the control precipitators. Dr. Harrison admitted on cross-examination that only a portion of the fly ash (between 20% and 30% depending on the type of boiler) actually leaves the boiler and goes to the control equipment. This same fact was later attested to by one of Edison's engineers. This error alone amounted to an overstatement of total particulate discharge by a factor of five. Dr. Harrison stated that he, in fact, knew little about the operational capacity of Edison's various control precipitators.

Dr. Harrison admitted that he did not know the purpose of the stack tests he used to determine a 2.5% sulfur content of the coal burned by Edison. Later Edison witnesses testified that 2.5% was not representative of the sulfur content of the coal used at the Indiana plant. The total amount of sulfur dioxide discharge from the station similarly appeared to be overstated.

Dr. Harrison testified that the validity of his model depended in large part on his data. He admitted that his information was inadequate. He stated, in fact, that much of his information was in error by a factor of a thousand, and that a detailed analysis from such data was necessarily insufficient. Dr. Harrison made no attempt to obtain additional information from Commonwealth Edison.

It was also revealed on cross-examination that Dr. Harrison's 57,155

---

[2] The national primary ambient air quality standards for sulfur dioxide is an annual arithmetic mean of 80 micrograms per cubic meter. The maximum 24-hour concentration which is not to be exceeded more than once a year is 365 micrograms per cubic meter. For particulate matter, the primary ambient air quality standard is an annual geometric mean of 75 micrograms per cubic meter. The maximum 24-hour concentration which is not to be exceeded more than once a year is 260 micrograms per cubic meter. See 40 C.F.R. § 50.7 inclusive (1973).

figure as to the amount of sulfur dioxide concentrations in the Chicago area is an instantaneous calculation. The federal standards are all stated in terms of average concentrations over periods of time—either annual means, or daily or hourly averages. Dr. Harrison's figure appears inordinately large to the numbers expressed by federal standards because he failed to express his ground level concentrations in terms of periods of time. Edison exhibited during cross-examination that Dr. Harrison's comparison of the federal public health standards to his concentration estimates from the Indiana plant was highly misleading.

Other data insufficiencies were brought out on cross-examination. Dr. Harrison did not take into account the station's stack effluent temperatures, exit velocities, stack diameters, or varying plume rises (the latter being dependent on the wind conditions of any given day). The record indicates that all of these factors, especially plume rise, are important in measuring emission dispersal in order to accurately determine ground level concentrations.

Finally, Dr. Harrison admitted that he had not made any effort to determine the background levels of either particulate matter or sulfur dioxide concentrations. The region where the Edison facility is located is heavily industrialized. Dr. Harrison stated that it was very difficult to prove that concentrations in the Chicago area were coming from one direct source.

Mr. John Bradley, an independent consulting meteorologist employed by Commonwealth Edison, was called by Edison to controvert much of Dr. Harrison's testimony. Bradley used a diffusion model study to determine the contribution of concentrations emitted from the Indiana station on the surrounding area. With the aid of computer drawn "isopleths" ("isopleths" are like isobars frequently utilized on weather maps), Mr. Bradley stated that average annual concentrations of sulfur dioxide in Chicago attributable to the Edison facility was 17 micrograms per cubic meter. Beyond an average of 6 miles into the Chicago area, Mr. Bradley stated that the station's contribution to concentrations of sulfur dioxide was less than 5 micrograms per cubic meter. The average annual concentration of particulate matter attributable to the Indiana facility in Chicago was shown by the Bradley study to be 1.4 micrograms per cubic meter. Both computations of the Indiana facility's contribution of ground level concentrations of sulfur dioxide and particulate matter were well below the applicable federal public health standards.

Mr. Bradley further testified that his study was based upon actual data encompassing all weather conditions, varying plume rise, and emission rate measurements for each stack in operation at the Indiana plant. All

of Bradley's calculations were averaged over periods of time, annually and daily, in order to make adequate comparisons with the federal standards.

Mr. James Fancher, a systems environmental engineer for Edison, was also called to dispute Dr. Harrison's testimony. Fancher testified that the sulfur content of the coal burned at the station since January, 1971, was 1.53%, and not the 2.5% figure assumed by Dr. Harrison. Fancher stated that the stack tests utilized by Dr. Harrison were conducted in order to determine the effect of various kinds of high or low sulfur coals on precipitator efficiencies and were not generally representative.

Mr. Byron Lee, Jr., assistant to the president of the Commonwealth Edison Corporation, testified that Edison had submitted new compliance plans for its facilities located in Illinois in order to meet Illinois' most recent pollution regulations. Mr. Lee also testified that Edison is in full compliance with pollution ordinances of Hammond, Indiana, which regulate sulfur dioxide emissions. Edison has also submitted compliance plans to the State of Indiana in order to meet future compliance standards.

Testimony relating to the deleterious health effects caused by pollution was offered by two witnesses for the City. Dr. Bertram Carnow, a physician with an extensive background in environmental medicine, presented and analyzed several studies exhibiting the adverse health effects of air pollutants. Dr. Carnow emphasized a major study conducted in Chicago involving 570 chronic bronchitis patients who were under the treatment of the University of Illinois School of Medicine. It was found that from among this group, the number of deaths from heart and lung diseases increased significantly on days, or during periods, of high pollution. Other studies revealed that an increase in respiratory diseases appeared to correlate with areas or times of high pollution for preschool children. Dr. Carnow testified that prolonged exposure to a sulfur dioxide concentration of 6,822 micrograms per cubic meter for a period of 4 hours would be harmful. Exposure to 754 or 750 micrograms per cubic meter of small suspended particulate matter would also be harmful according to Dr. Carnow. Both of these levels are above the federal standards. Dr. Carnow also described in great detail the various physiological reactions which can result from short-term and long-term exposure to air pollutants. ˙

Dr. Jean French, a research epidemiologist for the National Environmental Research Center, also testified to the adverse health effects of air pollution. Dr. French explained the methodology and the conclusions of the various "CHESS" studies (an acronym for Community Health Environmental Surveillance Studies). The "CHESS" studies are a series of epidemiology studies on the health effects of various environmental

exposures in selected areas. One such study indicated that there was a greater risk of acute respiratory disease for preschool children and their families located in higher-pollution areas than for families located in low-pollution areas. Dr. French also testified that a second "CHESS" study conducted in Chicago found that military recruits from city areas showed more upper respiratory disease than did the recruits from suburban or rural areas.

The "CHESS" studies outlined by Dr. French did not take into account ethnic background, various types of air contaminants, stress, or exposure to indoor pollution. Dr. French testified that the present federal standards were necessary to protect the health of the population, and that the levels of pollution measured in the "CHESS" studies were above the standard federal levels.

Dr. Yves Alarie, a professor of respiratory physiology and toxiocolgy at the University of Pittsburgh, was called by Edison to testify about the health effects caused by certain levels of pollution. Dr. Alarie stated that all the authority in the field indicated that adverse health effects from sulfur dioxide or particulate matter resulted only at extremely high ground concentration levels. Dr. Alarie stated that the concentrations emanating from the Indiana facility would not cause injurious health effects. Dr. Alarie also stated that many deaths have occurred in high-pollution episodes due to other types of pollutants besides sulfur dioxide or particulate matter.

■■■ The fact findings of a trial judge in a complaint for an injunction to abate a common law nuisance will not be disturbed on review unless they are manifestly against the weight of the evidence. (*Fink v. Board of Trustees,* 71 Ill.App.2d 276, 218 N.E.2d 240.) Where testimony is contradictory, as in the instant case, the trial judge is in a better position than a court of review to determine the credibility of witnesses and the weight of the evidence presented. *Schulenburg v. Signatrol, Inc.,* 37 Ill.2d 352, 226 N.E.2d 624.

■■■ A public nuisance is an unreasonable interference with a right common to the general public.[3] Earlier cases recognized that the public had a right to clean, unpolluted air and that any deprivation of that right was actionable as a private injury and indictable as a public wrong. (*Seacord v. People,* 121 Ill. 623, 13 N.E. 194.) However, the notion of pure air has come to mean clean air consistent with the character of the locality and the attending circumstances. Whether smoke, odors, dust or gaseous

---

[3] See Restatement (Second) of Torts § 821B (Tent. Draft No. 17, 1971). See also Bryson and MacBeth, *Public Nuisance, the Restatement (Second) of Torts, and Environmental Law,* 2 Ecology L. Q. 241 (1972).

fumes constitute a nuisance depends on the peculiar facts presented by each case. ( *City of Chicago v. Fritz,* 36 Ill.App.2d 457, 184 N.E.2d 713.) As a result of industrial expansion, the courts have utilized several factors in determining whether an industrial operation is an unreasonable interference with the right to clean air. One of those factors is the extent of injury or harm incurred to the public health, safety, peace or comfort. Another is a comparison of the operation's methods or effects to proscribed standards outlined by applicable federal, state, or local regulations. A third is the suitability of the industry's location. A fourth factor involves balancing the gravity of the harm done to the public against the utility of the defendant's business to the community as a whole.

■■ Courts of equity have traditionally been reluctant to enjoin an industrial operation unless it is clearly and satisfactorily proven to be a nuisance. ( *Rosehill Cemetery Co. v. City of Chicago,* 352 Ill. 11, 185 N.E. 170.) If the right to relief is doubtful, either as to the law or under the facts presented, equitable relief will not usually be granted. *Klumpp v. Rhoads,* 362 Ill. 412, 200 N.E. 153; *City of Pana v. Central Washed Coal Co.,* 260 Ill. 111, 102 N.E. 992.

■■ The City has failed to answer the threshold question of whether Edison's Indiana facility causes substantial harm so as to constitute an actionable invasion of a public right. In order to be entitled to injunctive relief, a substantial harm or injury must be clearly demonstrated. ( *Haack v. Lindsay Light & Chemical Co.,* 393 Ill. 367, 66 N.E.2d 391.) Edison's Indiana facility is located in a highly industrialized area. The character of the locality necessitates that unpleasant odors, smoke and film will exist. These conditions in an industrial area have generally not been considered to be public nuisances. *Gardner v. International Shoe Co.,* 386 Ill. 418, 54 N.E.2d 482; *Haack v. Lindsay Chemical Co.,* 393 Ill. 367, 66 N.E.2d 391.

■■ We are not unmindful of the harsh health effects caused by air pollutants as illustrated by the various studies presented by the City at trial. Nor are we ignoring the importance of reducing highly pollutant emissions emanating from congested industrial areas. However, the record clearly indicates that the City did not demonstrate injury to public health as a direct result of the emissions from Edison's Indiana facility. The ground-level concentrations of sulfur dioxide and particulate matter offered by the City's witnesses were not expressed in terms of time so as to be compared with federal standards. No connection, if any, was made between plume opacity readings of smoke from the Edison stacks and harm to the public health. Edison offered credible testimony which demonstrated that the Indiana facility's contribution of sulfur dioxide and particulate matter ground level concentrations were well below the

levels proscribed by the federal regulations, or even by the Hammond city ordinances. Although we are not bound by federal air-pollution standards in deciding whether the facility's emissions constitute a common law nuisance, those standards offer us guidelines in the determination of the reasonableness of the operation and the extent of any harm to the public. All of the public health testimony signified that concentration levels below the federal standards were not substantially harmful to the public health. Moreover, the City could not clearly establish that the Edison plant was the direct cause of harmful pollution in Chicago, distinguishing the facility from other emission sources located in the area.

The record clearly indicates that the trial court's findings were not against the manifest weight of the evidence. The City did not demonstrate that emissions from the Edison facility in Hammond, Indiana constituted a common law nuisance to the residents of Chicago. No unreasonable or substantial injury was evidenced. The record does not justify enjoining the operation of Edison's Indiana power plant. The judgment is affirmed.

Judgment affirmed.

EGAN, P. J., and HALLETT, J., concur.