THE VILLAGE OF WILSONVILLE *et al.*, Plaintiffs-Appellees, *v.* SCA SERVICES, INC., Defendant-Appellant.—THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Plaintiff-Appellee, *v.* SCA SERVICES, INC., Defendant-Appellant.

Fourth District   Nos. 15080, 15081 cons.

Opinion filed September 21, 1979.—Rehearing denied December 3, 1979.

Fred C. Prillaman, of Mohan, Alewelt & Prillaman, of Springfield, Stuart Dobbs, of Denby, Dobbs & Meno, of Carlinville, William C. Brashares and Melvin J. Duvall, Jr., both of Cladouhos & Brashares, of Washington, D. C., and Lawrence C. Hutchings, of Boston, Massachusetts, for appellant.

Paul C. Verticchio, of Gillespie, Kenneth R. Boyle, State's Attorney, of Carlinville, and William J. Scott, Attorney General, of Springfield (Ann Carr, A. L. Zimmer, and Rick Verticchio, Assistant Attorneys General, of counsel), for appellees.

Dorothy A. Darrah, of Washington, D.C., and Mary Bryant Kodani, of Chicago, both for *amicus curiae* United States Environmental Protection Agency.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant SCA Services, Inc., successor in interest to Earthline Corporation, appeals a judgment of the circuit court of Macoupin County entered in two consolidated cases enjoining it from continuing operation of a chemical hazardous waste landfill near Wilsonville in that county and ordering it (1) to remove all toxic waste buried there together with any contaminated dirt and (2) to restore and reclaim the site area. We have found the questions presented to be very difficult but conclude that the decision of the trial court was not erroneous. We affirm.

On April 18, 1977, plaintiff Village of Wilsonville (the Village) filed suit against defendant seeking injunctive relief. On April 29, 1977, and May 9, 1977, respectively, plaintiffs Macoupin County and Macoupin County Farm Bureau were granted leave to intervene and filed separate complaints making allegations and seeking relief similar to that of the Village. This case is our No. 15080. Our case No. 15081 arises from a somewhat similar complaint filed by the Attorney General on May 26, 1977. After various preliminary proceedings, the cases were consolidated for a bench trial which began on June 7, 1977, and culminated in the appealed judgment entered on August 28, 1978.

The general theme of the complaints was that the operation of the landfill and the transportation of hazardous substances to it constituted a common-law nuisance and also brought about pollution as prohibited by the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1001 *et seq.*).

The difficult decisions involved in this case are of considerable public importance. The need for a proper method of disposal of hazardous chemicals is not disputed. The Illinois Environmental Protection Agency (IEPA) has licensed defendant to operate the landfill and to receive the

substances which are being buried there. The United States Environmental Protection Agency (USEPA) has been permitted to file an *amicus curiae* brief which sets forth its need for the use of the landfill and requests that this need and that of the public for the use of the landfill be taken into consideration in our determination of "the remedy appropriate to abate any actionable harm that may exist." On the other hand, the great need for a proper place to bury these substances indicates that they are capable of causing substantial harm to people if not sufficiently contained. Plaintiffs and many persons living in the area are greatly concerned with the dangers involved and question the adequacy of the site for such a landfill and also the manner of its operation.

The conflicting considerations involved are reflected in the issues raised by defendant on appeal. It contends that (1) the trial court either lacked subject matter jurisdiction to proceed with the case or should have deferred to the jurisdiction of administrative agencies under the doctrine of primary jurisdiction; (2) that court's decisions that the site constituted an active nuisance and a prospective one were contrary to the manifest weight of the evidence; (3) the trial court committed reversible error in (a) basing its decision primarily on the theory that defendant's use of the site constituted a nuisance *per se*, (b) failing to consider equitable factors favoring continuance of the operation of the landfill, (c) refusing defendant's motions for change of venue, and (d) ruling on various motions and evidentiary matters; and (4) the judgment amounted to a taking of its property without just compensation.

The landfill is located on 130 acres of land in and adjacent to the southern border of the Village. The site is surrounded on the west, south and east by farmland. The Village itself is also surrounded to the west, north and east by farmland. The entire site, the Village and much of the surrounding area is located above the now-abandoned Superior Coal Mine No. 4, which operated from 1917 to 1954. The mine exploited the No. 6 seam, found in this area at a depth of 312 feet, using the room and panel method whereby about 50% of the coal is left in pillars. The byproducts from the coal extraction and cleaning were dumped behind the mine buildings. That "gob pile" was more than 30 feet high and covered more than 30 acres. Its depth was unknown. About a foot of that same mine spoil covered the surface of the ground in random areas throughout the site.

The Village has no sewage treatment plant and no municipally owned sewage system. Most homes are served by septic tanks and some homes and businesses are connected to private sewers. The water distribution system is centralized and water is purchased from Gillespie. The system was built in 1952 after the Village tried unsuccessfully to find

sufficient water by drilling municipal wells in the area. There are still 73 water wells in the Village, some of which are used to water gardens or wash cars. At least one well is used to water pets, and another is used for drinking water. South of defendant's site, approximately one-half mile from the gob pile, is the Vassi Spring, the owner of which intends to use it as his water supply when he builds his home. Further south are four more springs used to water livestock.

On February 11, 1976, defendant Earthline Corporation applied to IEPA for a permit to develop and operate a solid waste management site on the 130 acres. The original application included information on ground water, soil permeabilities, subsidence, and subsurface and hydrogeologic conditions. Additional information and revisions were also submitted. A developmental permit was issued May 19, 1976. On September 8, 1976, defendant applied to the IEPA for an operational permit, which was issued on September 28, 1976. Defendant was required to obtain separate supplemental permits from the IEPA for each waste sought to be buried at the site. Defendant had obtained 185 such permits prior to the first day of trial.

The existence under the mine spoil of stratas of tight clay was a principal reason for defendant's selection of the site for a landfill. The top strata extended to a depth of 10 to 12 feet. This was followed by a very thin layer of more permeable saturated clay called the Sangamon Paleosal. This layer was not continuous but existed in various places throughout the area. A strata of tight clay for an additional depth of more than 10 feet existed underneath the Paleosal.

Defendant dug trenches in the clay to a depth of 10 to 12 feet, a width of 50 feet and a length of 75 to 350 feet with a space of 10 feet between the trenches. The hazardous substances delivered to the site were placed in the trenches and covered with the clay dug from the trenches or, on at least one occasion, with soil from the "gob pile." By the time of trial, seven trenches had been dug. Three had been completely filled while two were two-thirds full and the other two had not yet been used. Defendant operated in this manner, receiving and burying hazardous materials for which it had permits, from November 1, 1976, until closed by the order on appeal.

Before we consider the evidence of the geology of the site and defendant's method of operation we must pass upon defendant's assertion that the trial court either lacked jurisdiction to hear the case or, in the alternative, should have deferred to the concurrent jurisdiction of the administrative agencies, IEPA and the Illinois Pollution Control Board (IPCB).

Defendant's theory that the trial court lacked jurisdiction is based

upon analogy to the decisions in *O'Connor v. City of Rockford* (1972), 52 Ill. 2d 360, 288 N.E.2d 432, and *Carlson v. Village of Worth* (1975), 62 Ill. 2d 406, 343 N.E.2d 493. There the court held that non-home-rule units of local government could not, by zoning or requiring permits, prohibit the operation of a landfill licensed by IEPA. The court's theory in those cases was that to permit a local unit to prevent the operation of a landfill by "locally empowered conditions" would negate the legislative intent of the Environmental Protection Act "to establish a unified, state-wide program supplemented by private remedies * * *." Ill. Rev. Stat. 1973, ch. 111½, par. 1002(b); *Carlson*, 62 Ill. 2d 406, 416, 343 N.E.2d 493, 498-99.

The issue in the foregoing cases was the power to license and to zone as between the State agency and local units of government. Even as to that issue, the supreme court has held that there is a concurrent power in local units that have home rule power. (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553; *City of Chicago v. Pollution Control Board* (1974), 59 Ill. 2d 484, 322 N.E.2d 11.) Here, the issue is between the State agency and the judicial branch of the government.

All plaintiffs sought an injunction on the common law theory of nuisance and the County of Macoupin and the Attorney General also sought to abate violations of the Environmental Protection Act.

Article VI, section 9, of the Illinois Constitution of 1970 grants circuit courts original jurisdiction over "all justiciable matters" with exceptions not applicable here. Section 1 of "An Act to revise the law in relation to injunction" (Ill. Rev. Stat. 1977, ch. 69, par. 1) makes injunctions justiciable remedies and an injunction has been recognized as a remedy for a nuisance. (*Ruth v. Aurora Sanitary District* (1959), 17 Ill. 2d 11, 158 N.E.2d 601.) Section 45(a) of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1045(a)) states that civil or criminal remedies are not impaired by the Act. Sections 42(d) and 43(a) of the Act (Ill. Rev. Stat. 1977, ch. 111½, pars. 1042(d) and 1043(a)) authorize the Attorney General or State's Attorneys, on their own motion or at the request of IEPA, to seek injunction (1) to restrain violations of the Act, or (2) "[i]n circumstances of substantial danger * * *" to halt activity causing the danger, respectively. Of even greater significance is section 2 of "An Act in relation to the prevention and abatement of air, land and water pollution" (Ill. Rev. Stat. 1977, ch. 14, par. 12), which states in part:

> "The Attorney General has the power and authority, notwithstanding and regardless of any proceeding instituted or to be instituted by or before the Environmental Protection Agency, Pollution Control Board or any other administrative agency, to prevent air, land or water pollution within this State by commencing an action or proceeding in the circuit court of any

county in which such pollution has been, or is about to be, caused or has occurred, in order to have such pollution stopped or prevented either by mandamus or injunction."

In *People ex rel. Scott v. Janson* (1974), 57 Ill. 2d 451, 312 N.E.2d 620, the Attorney General sued to enjoin pollution alleged to arise out of the operation of a dump. An *ex parte* injunction was issued pursuant to section 43(a) of the Act. Later, the trial court concluded that substantial danger, which was a condition precedent to action under section 43(a), did not exist and dissolved the injunction. Subsequently, an agreement was reached in which the defendant dump operator stipulated to discontinuing certain practices. Still later, the operator was held to be in contempt for breaching his agreement to discontinue the improper practices. On appeal, the operator maintained that the trial court's jurisdiction was dependent on the existence of substantial danger and that as the trial court had lost jurisdiction prior to the agreement when it determined that no substantial danger existed, the agreement was void. The supreme court disagreed, stating that the power of the courts and the administrative agencies to abate pollution was concurrent.

■■ We are painfully aware of the lack of expertise in courts to fully understand the complicated technical matters involved in a case of this nature. However, the decision in *Janson* and the various statutes we have cited clearly indicate a policy in this State not to leave the enforcement of environmental matters exclusively in the hands of administrative agencies but to have a dual system of enforcement and civil relief. The causes of action set forth here involve "justiciable matters."

■■ Defendant points to *Village of South Elgin v. Waste Management of Illinois, Inc.* (1978), 62 Ill. App. 3d 815, 379 N.E.2d 349, where the village had brought suit in court to have landfill permits declared void. The appellate court held that no cause of action lay because the village had an adequate administrative remedy which had been established by rules enacted by the Pollution Control Board. Defendant asserts that because the issue here concerns the same questions of the adequacy of the site as a landfill as were before IEPA at the time it decided to issue the permits, this suit is also an attempt to review the issuance of the permits. However, here no request was made to revoke the permits. Rather, the requested relief was the enjoining of conduct alleged to create a nuisance and to cause pollution. Moreover, in *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 387 N.E.2d 258, the supreme court has held that Pollution Control Board regulations purporting to permit an administrative appeal from the issuance of landfill permits were invalid. Furthermore, the existence of landfill permits is not even an affirmative defense to an administrative action brought under section 31(b) of the Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1031(b); *Landfill, Inc.*). If the existence of such

permits is not *res judicata* in that type of administrative proceeding, it clearly would not deprive the court of jurisdiction here.

The circuit court correctly determined that it had subject matter jurisdiction.

■■ Defendant's argument that the circuit court should have deferred to the administrative agencies (IEPA and IPCB) is based on the doctrine of "primary jurisdiction" which has been described as follows:

> "Under the primary jurisdiction doctrine the courts cannot or will not determine a controversy involving a question which is within the jurisdiction of an administrative tribunal prior to the decision of that question by the administrative tribunal (1) where the question demands the exercise of administrative discretion requiring the special knowledge, experience, and services of the administrative tribunal; (2) to determine technical and intricate matters of fact; and (3) where a uniformity of ruling is essential to comply with the purposes of the regulatory statute administered." 2 Am. Jur. 2d *Administrative Law* §788, at 689 (1962).

Although many Illinois cases have alluded to the need of Illinois courts to defer to the expertise of administrative agencies, none have held error to have occurred because a court failed to apply the "primary jurisdiction" doctrine. In *Metropolitan Sanitary District v. United States Steel Corp.* (1975), 30 Ill. App. 3d 360, 332 N.E.2d 426, and *People ex rel. Scott v. United States Steel Corp.* (1976), 40 Ill. App. 3d 607, 352 N.E.2d 225, the appellate court held that trial courts did not err in refusing to stay proceedings in cases brought to enjoin allegedly polluting conduct until a similar matter had been decided by a Federal environmental agency. Those cases differ from this one in that there the Illinois standards which were the subject matter of the law suits were more strict than the Federal standards being considered by the agency. However, the opinions recognize the importance placed by the Environmental Protection Act upon the availability of judicial remedies.

For different reasons, both sides call our attention to a comprehensive opinion written by the late Associate Justice Tom C. Clark sitting by designation in *Harrison v. Indiana Auto Shredders Co.* (7th Cir. 1976), 528 F.2d 1107, where, in ruling that a district court had improperly enjoined the operation of an automobile shredding plant, the court stated that despite the problems of judicial intervention in solving environmental problems, "the right of environmentally-aggrieved parties to obtain redress in the courts serves as a necessary and valuable supplement to legislative efforts to restore the natural ecology of our cities and countryside." 528 F.2d 1107, 1120.

■■ The same legislation and judicial precedent which convince us that the trial court had jurisdiction in this case also persuade us that there is no

policy of this State that requires trial courts to defer to administrative agencies in cases of this nature. Indeed, the legislature has expressly stated that the Attorney General may proceed in court even in cases where an administrative proceeding is in progress. We conclude that the trial court did not err in refusing to defer to administrative action in this case.

The trial court's finding that the operation of the site constituted a present and future nuisance was based upon evidence of the following: (1) dust and odors being presently emitted from the site, (2) the transportation of hazardous materials through the Village en route to the site, and (3) ultimate pollution of the air and water from the burial of hazardous materials at the site.

Fifteen residents of the Village testified that beginning about the middle of May 1977, they smelled odors variously described as musty, putrid, like mold, ammonia, fertilizer, insecticide, dirty feet or stagnant water or like burning plastic, electrical wires or rubber. Several testified that the odors caused their eyes to burn, their nose to run, or their head to ache, made them nauseous or short of breath or gave them a raspy voice and throat. Many of these same witnesses testified to being bothered by dust blowing from the site. Some testified that the combination of dust and odors prevented them from using their yards for recreation, gardening and other activities. Defendant presented several witnesses who refuted this testimony and indicated that offensive odors came from the prevalent use of burn barrels to dispose of refuse and from the dumping of sewage into an open creek that went through the Village. Witnesses for both sides had some bias. Some for the plaintiffs had a strong desire that the landfill be closed. Some for the defendant had a business relationship with defendant or other reason to desire that the facility remain open. In any event, because of the conflicting evidence, we do not find the trial court's determination that the site gave off odors and dust damaging the well-being of residents of the Village to have been contrary to the manifest weight of the evidence.

The only feasible route to the site required trucks bringing in hazardous materials to travel on Wilson Avenue, the main street of the Village. Sixty-five residents lived on that street and various businesses, churches and government buildings were located thereon. Most of the trucks used had an open-bed and the materials transported were usually in drums. The drums were usually sealed, but some were open or merely covered. Defendant's receiving reports indicated that rusting and leaking drums containing hazardous substances had been received. Twice, when open drums of liquid polychlorinated biphenyls (PCB's) were received, materials had been splashed on the floor of the truck's open-bed. Three residents testified that on May 18, 1977, a truck marked "poison" and carrying two open vats leaked a liquid from the floor of its open-bed onto

Wilson Avenue. According to defendant's records, vats received that day contained $C_5$, $_6$, a material toxic to persons through ingestion, inhalation or skin contact.

■■ An IEPA employee testified that trucks containing agricultural chemicals having a greater acute toxicity than PCB's are routinely transported through towns. Nevertheless, the trial court could have properly concluded that the transportation of hazardous materials through the Village in the manner done by defendant presented some hazard to its inhabitants.

The foregoing was the substance of the evidence of present harm or immediate danger suffered by the public as a result of the operation of the landfill. However, the major dispute between the parties concerns claims of a danger of very serious harm to the public occurring in the future as a result of the landfill's existence and operation. This threat was primarily based upon the possibility that hazardous substances will migrate from their burial spot in the trenches into the underground water systems and thence into open streams or to the surface. The other threat was that hazardous substances would combine at the burial site to ignite, explode or give off noxious fumes or some combination of the three.

Although most of the substances were buried in containers, defendant admits that the containers will decompose eventually, at least, and does not rely upon them to hold the buried substances in place. Rather, reliance is placed upon the ability of the soil to retain the substances and the tendency of those substances to remain in place in that soil. Substantial evidence was presented that many of these substances were extremely toxic to humans. It is undisputed that exposure to those materials through skin contact, inhalation or ingestion causes skin disease or irritation, adverse pulmonary effects, neurological damage or damage to other organs. In addition, some of the materials are actual or suspected carcinogens. The health effects of many of those substances are dose- and time-related, the greater or more prolonged the exposure, the more serious the health consequences. However, the fact that prolonged exposure to some substances is required before they become toxic to humans does not diminish their danger. Should the materials leave the site, it would be difficult if not impossible to control or remove them from the environment and health effects might not be noticed until substantial exposure had already occurred.

The long-term catastrophic consequences that would likely result if substantial amounts of the controlled substances did migrate from the landfill is the heart of our disposition in this case.

Experts for both sides recognized that the capacity of the underlying soil at the site to transport fluid was a very important factor in

determining the extent to which the buried substances would be likely to migrate. This characteristic of the undersoil is called permeability. These witnesses agreed upon the existence of a method to examine samples of the soil to obtain a permeability coefficient (calculated in negative powers of 10) which was an estimate of the number of centimeters per second that fluid would travel through the particular soil.

Two consultants retained by defendant, John Mathes, a professional engineer in private practice, and James Williams, Ph.D., an engineering geologist with the Missouri Geology and Land Survey, testified to having made calculations of permeability from samples taken from the site. Mathes did so both before and after the site was in operation. His first samples were obtained by making borings at various spots in the area where burial was to take place. He stated that he bore to a depth of 50 feet and took samples at various depths in an attempt to find the most porous underlying substance within the depth. The calculations made upon these samples ranged from $7.4 \times 10^{-8}$ cm/sec. to $1.2 \times 10^{-8}$ cm/sec. (The formula operates in such a way that the higher the negative exponent is, the less is the permeability of the soil.) After the landfill was in operation he took samples from or near the bottoms of the trenches that had been dug and obtained results from $1.4 \times 10^{-7}$ cm/sec. to $.9 \times 10^{-8}$ cm/sec. Dr. Williams took samples only after the operation of the landfill had started and obtained results ranging from $7 \times 10^{-6}$ cm/sec. to $1 \times 10^{-7}$ cm/sec.

On behalf of plaintiffs, Dr. Nolan Aughenbaugh, chairman of the department of mining, petroleum and geological engineering at the University of Missouri at Rolla, examined the site and various documents concerning it. He testified that an IEPA report indicated various oxidized spots in the undersurface extending to a depth of 25 feet which would have a much greater permeability than the surrounding matter. He explained that the oxidation occurred by the areas coming in contact with the atmosphere in some way, as for example when roots pushed through the soil and then decayed leaving an air space. He testified that in inspecting the trenches he found various root holes and other channels as large in diameter as a finger. Dr. Aughenbaugh also stated that this report indicated that the clay undersurface included silty or sandy lenses where the porosity would be greater than that of the clay.

Dr. Aughenbaugh also expressed an opinion that when the deposited hazardous substances were covered, the clay used for fill would never regain its former impermeability. Thus if water were to enter the trench from an artesian source, the pressure on the water would cause it to rise through the fill to the top of the trench rather than be absorbed through the sides of the trench and could thus transport hazardous substances to

the surface and out of the trench. Defendant's testimony disputed that the fill could not be restored to its former tightness, but the trial court could have found Dr. Aughenbaugh's testimony to be more believable.

Subsequent to granting permits, IEPA adopted, as a suggested standard for hazardous waste landfills, a permeability rate, measured by the method used here, of no greater than $1 \times 10^{-8}$ cm/sec. Bearing in mind that under the formula, the lower the negative exponent, the faster fluids will move through the soil, the test results obtained by defendant's witnesses cast doubt as to whether the soil was tight enough to meet those IEPA standards in force at time of trial. Further doubt arose from the testimony of Dr. Williams, in which he stated that the permeability of the soil in the immediate area was generally considered to be greater than $1 \times 10^{-8}$ cm/sec. and that he would not expect the average permeability of the soil in the landfill to be as low as that used for samples. The totality of this evidence was at the heart of plaintiffs' assertion that the site was inadequate for a hazardous waste landfill.

The ability of the undersurface to adequately contain the hazardous substances was also questioned by evidence that, apparently as a result of collapse in the underlying abandoned mine, subsidence of the surface with accompanying cracks in the soil was taking place and would continue to do so. An official of the United States Bureau of Mining testified that generally subsidence could be expected 40 years after a mine had been abandoned. The evidence was undisputed that, here, considerable subsidence had already taken place. A report in evidence, made in 1934, 20 years before the mine was closed, indicated that subsidence had started as early as that date.

Dr. Aughenbaugh testified that in his opinion a subsidence crack could develop which would extend all of the way to the top of the mine. Expert witnesses called by defendant disputed this. In their opinion, because of the nature of the abandoned mine, the rock strata above the mine and the clay strata at the surface, cracks would not be deep, would close in a short time and, if necessary, engineering techniques could be used to repair the cracks. In general, they concluded that cracks would not be as deep as the bottoms of the trenches and would not affect the subsurface flow of seep water.

The opinions of defendant's experts were challenged to some extent by evidence of a crack that had occurred in the area. Aughenbaugh first observed and photographed a subsidence crack on the Wilbur Sawyer farm on June 17, 1977. Nine months later on March 22, 1978, Aughenbaugh returned to the Sawyer farm. Using a backhoe, a trench was dug perpendicular to the subsidence crack so that the depth could be determined. After the trench was excavated to a depth of 8 feet it was apparent that the crack extended downward the entire depth of the

trench and in Aughenbaugh's opinion continued down beyond the bottom of the trench. When the backhoe operator reached a depth of 4 to 4½ feet, water began to enter the trench through subsidence fractures, including a subsidence crack which was not visible at the surface but which began 4 feet from the surface and went down from there. The water in the trenches at times was 3½ feet deep. A green dye was poured into the subsidence crack on the surface, 10 feet from where the trench was being dug. In 25 minutes the dye entered the side of the trench through the subsidence crack and also came up from the bottom of the trench.

This subsidence crack was much deeper than those predicted by defendant's experts and was deeper than earlier thought to be by one of defendant's witnesses who had measured it by placing a probe into it. The flow of dye through the crack showed that the cracks were capable of transporting both surface and ground water. This crack had not closed itself but had remained open for 9 months. The existence of a crack underground indicated that cracks could exist that would give no warning of their need to be repaired. Another of defendant's experts had estimated one of the cracks at the Wilbur Sawyer farm to be 100 to 150 feet long. As the burial trenches at the site were only 10 feet apart, a crack of this length could severely impair the ability of the trenches to contain liquids within the trenches. As the soil at the Sawyer farm was stated to be of the same quality as that in the landfill, the situation at the farm was of considerable significance.

Further question as to the ability of the soil to hold liquids arose from the undisputed testimony that during the approximately 50 years of the existence of the gob pile, chemicals contained there had migrated sufficiently that they contaminated all of the monitoring wells sunk by defendant on the perimeter of the site. These wells were from 200 to 950 feet from the gob pile. A similar ratio of chemicals was found in the Vassi Spring located about one-third mile south of the site. Donald L. Warner, Ph.D., a professor in Dr. Aughenbaugh's department, testified that in his opinion this similarity of the ratio of chemicals indicated that the spring had also been contaminated by the substances in the gob pile. Witnesses for the defendant disputed this opinion but had no explanation for the similarity of contamination between the monitoring wells and the spring.

According to the evidence, another factor which determines whether and when a hazardous substance will migrate from the landfill is the physical and chemical interaction between the hazardous substance and the soil. The parties do not dispute that if the substances are dissolved in a solvent, they will migrate rapidly. However, Robert Griffin, a geochemist with the Illinois State Geological Survey, testified that unless PCB's, $C_5$, [6] or other hydrocarbons were in a solvent solution they would not migrate

with liquids but would tend to remain with the soil in which they were deposited. Griffin described the process which keeps these substances in place as being called attenuation.

The only testimony presented by plaintiffs which concerned the process of attenuation was that of Stephen Hall, an assistant professor of chemistry at the Edwardsville campus of Southern Illinois University. He did not dispute the testimony of Griffin that the substances mentioned by Griffin would not migrate unless they were in solution. However, Hall did state that PCB is soluble in paint thinner and slightly soluble in water. The evidence showed paint thinner to have been deposited in the same trenches as PCB's.

In its applications for permits to bury PCB's, herbicides, paint sludge and NaCn, defendant stated that it would be necessary to keep these substances free from ground or surface water. The court could have found that defendant would have difficulty in doing so. Defendant's witness, Dr. Williams testified to water having seeped into the open trenches. Some of the various lenses testified to by Dr. Aughenbaugh contained water and could serve as conduits to bring water into or near the trenches even if these lenses had no connection to a system of ground water that would flow outside the site. Small conduits created by dead roots could also carry water short distances. If, as suggested by Dr. Aughenbaugh, the fill used in the trenches had lost its impermeability and water from artesian sources seeped through it, this would result in another possibility of contact between hazardous substances and water. The possible presence of the water and the channels through which it might flow increased the likelihood that (1) it might make the hazardous substances more soluble or (2) better solvents might have more opportunity to come in contact with the substances and increase their ability to migrate. The danger was not limited to the commingling of substances from the same trench. The trenches were only 10 feet apart and the likelihood of some lateral movement through channels would, over many years, permit a meeting of substances from different trenches.

The possibility that buried hazardous substances might interact was also at the heart of plaintiffs' contention that the site presented a threat to pollute the air by causing chemical explosions, fires or the emission of poisonous gas. Arthur Zahalsky, Ph.D., professor of biochemistry and head of the laboratory of biochemical parasitology at Southern Illinois University at Edwardsville prepared an exhibit, based on defendant's receiving reports and trench logs, which showed that various substances which he deemed to be incompatible were buried in the same trench. The witnesses for the opposing sides disagreed as to whether fires, explosions or the emission of poisonous gas were likely to result. In addition to disagreeing that certain intermixing of substances would cause a problem,

defendant's witnesses also contended that (1) the clay soil would retard fires, and (2) lime placed on certain substances would prevent them from being the basis for the formation of poisonous gas.

■■ Defendant claims to have established that (1) the nature of the soil at the site was nearly ideal for a landfill because of its lack of porosity and because it had other qualities deterring migration of substances, (2) subsidence would be unlikely to cause sufficient rupture to aid escape of the substances, (3) incompatible materials were not stored together and materials were placed with the hazardous substances which would tend to prevent the hazardous substances from coming in contact, and (4) many of the substances had inherent qualities deterring their migration. Some of the foregoing evidence and other evidence not discussed in this opinion tend to prove these assertions. However, conflicting evidence was probative of a different conclusion. These issues were questions of fact for the trier of fact.

Although defendant does not seriously dispute the severe damage likely to result if substantial amounts of hazardous substances escaped from the landfill or if the explosions, fires or emissions feared by plaintiffs occurred, it vigorously urges that the possibility of any of these things taking place is too uncertain and, in any event, too far in the distant future to form the basis for the issuance of an injunction either on a common-law nuisance theory or because of violations of the Illinois Environmental Protection Act. Defendant concedes the burden of proof in the latter type of proceeding to be no greater than in the common-law action.

Defendant refers us to our recent decisions in *People ex rel. Difanis v. Futia* (1978), 56 Ill. App. 3d 920, 373 N.E.2d 530, a case concerning a request to enjoin the operation of a theater and studio featuring nude female models. The petitioner's theory was that if permitted to continue to operate, the models might perform acts of prostitution. In affirming the dismissal of the complaint we stated,

> "The general rule is that while an injunction will be granted only to restrain an actual, existing nuisance, a court of equity may enjoin a threatened or anticipated nuisance where it clearly appears that a nuisance will necessarily result from a contemplated act or thing which is sought to enjoin. (*Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 218 N.E.2d 240.)" 56 Ill. App. 3d 920, 926, 373 N.E.2d 530, 535.

■■ While the foregoing is the general rule, we do not deem it necessary here that the evidence clearly show that the harm envisioned by plaintiffs' witnesses will "necessarily result" in order for the danger presented by the existence and operation of the landfill to be a basis for the injunction.

More analogous to the present situation are cases of prospective nuisance which involve drainage. In *Springer v. Walters* (1891), 139 Ill.

419, 28 N.E. 761, the supreme court affirmed a trial court's dissolution of an injunction which prevented owners of property in a drainage district which had been annexed to a city from attaching to the drain of the district. The petitioners were other property owners of the district who claimed that the district drains would be overloaded eventually. Noting that any overload would take place, if at all, in the distant future, the court stated that to obtain an injunction under those circumstances, the "allegation must be distinct and clear" and supported by evidence "removing all substantial doubt that the threatened injury is substantial * * *." (139 Ill. 419, 422, 28 N.E. 761, 762.) Similarly in *Union Drainage District No. 6 v. Manteno Limestone Co.* (1950), 341 Ill. App. 353, 93 N.E.2d 500, the appellate court reversed an order enjoining operators of a limestone quarry from using the drains of the drainage district in which the quarry was located. The petitioners' claim of injury was that some time in the distant future the drains might become inadequate to carry the drainage from the quarry thus causing overflows which would damage land and crops in the district.

In *Barrett v. Mount Greenwood Cemetery Association* (1896), 159 Ill. 385, 42 N.E. 891, an injunction was sought against a cemetery association's drainage of its burial ground into a stream by means of a sewer. A master to whom the case was referred found that the bodies buried in the cemetery would give off germs which would eventually be carried to the sewer and into the stream. The trial court sustained objections to the master's report and dismissed the case for want of equity. The supreme court reversed and remanded with directions to follow the master's report. In the face of sharply conflicting similar evidence, the Supreme Court of Nebraska upheld the issuance of an injunction prohibiting the opening of a cemetery in *Lowe v. Prospect Hill Cemetery Association* (1899), 58 Neb. 94, 78 N.W. 488.

*Springer* and *Union Drainage District No. 6* speak of the requirement of certainty of proof that the damage would be substantial rather than insubstantial. Here, there is little dispute that the damages would be very substantial if the fears of the plaintiffs materialize. Both opinions, however, also emphasize that, as here, the damage feared would take place only in the distant future and that this was a reason why an injunction was inappropriate. *Barrett* and *Lowe* on the other hand approve of injunctive relief even though the damage to be prevented was projected in the distant future, after buried bodies decomposed and the spread of bacteria was caused by seeping groundwaters.

■■ In the case before us, evidence that hazardous substances would actually migrate out of the landfill and contaminate outside areas was, at best, uncertain, contingent upon the existence of conditions in the subsurface which were not known and also contingent upon the

occurrence of future happenings in regard to subsidence or accidental contact between substances. Considering the length of time required to contain the substances in the landfill because of their toxicity, however, we conclude that the trier of fact could have determined that there was a reasonable likelihood that escape would take place sometime in the future.

No showing was made of a feasible method to protect the public if the hazardous substances did start to migrate out of the site. Evidence was presented that if these substances reached the monitoring wells, plans would call for digging of intercepting trenches. However, it would appear that such trenches could not feasibly be dug around the entire landfill at a depth to assure interception of substantially all migrating substances. Moreover, the operators of the landfill would have great difficulty in determining what to do with the intercepted substances because most of it would not be treatable. IEPA apparently had all of this in mind when it adopted guidelines for permit applications which classified hazardous waste landfills receiving materials of the nature taken in by defendant as a Class I operation where the site must be sufficient to contain the substances *without engineering* and where protection of the surrounding area was *not dependent on leachate collections.* If, as claimed by plaintiffs' witnesses, the substantial likelihood of leachate existed, the site did not meet IEPA requirements.

■■ Because the danger of escape of the hazardous substances was not of certain proof and prospective as to actual infliction of injury but of a nature that would likely be catastrophic if it did occur, we consider the following to be uniquely applicable to the case. In speaking of the propriety of the remedy of injunction to prevent torts, including nuisances, Restatement (Second) of Torts §933, comment on subsection (1) (1977) states in part:

> "*Threatened tort.* The expression 'threatened tort,' as used in Subsection (1) of this Section, contemplates, as a condition for the grant of an injunction, a threat of sufficient seriousness and imminence to justify coercive relief. The seriousness and imminence of the threat are in a sense independent of each other, since a serious harm may be only remotely likely to materialize and a trivial harm may be quite imminent. *Yet the two elements must be considered together in the decision of any given case. The more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote.*" (Emphasis added.)

■■ The trial court could have determined from the evidence that the harm that would impend because of the danger that hazardous substances might escape was so serious that no justification existed to deny the

injunction even though the feared harm was uncertain as to occurrence and, in any event, unlikely to occur until the distant future.

Defendant asserts that because of failure of the evidence to prove actual existing harm, the trial court must have been ruling that defendant's operation was a nuisance *per se* but that it cannot be a nuisance *per se* because it was not a nuisance under all circumstances and in all places. As far as the circumstances of the case are concerned, we agree with Professor William L. Prosser that classifying nuisances as *per se* or *per accidens* is of no help in analysis. Prosser, Torts §87, at 582-83 (4th ed. 1971).

The most perplexing aspect of this case is the undeniable need for facilities to dispose of hazardous waste. Testimony presented by an agent of the USEPA's Hazardous Waste Management Division indicated that of the four common methods of disposal, the instant landfill method was the least desirable. The other three in order of desirability were (1) recovery of the material for further use, (2) detoxification, and (3) incineration. Other evidence showed that great difficulties were involved in effectuating any of the other methods on the scale required to meet the problems presented by the growing amount of hazardous industrial waste. The need for the instant facility was indicated by its licensing by IEPA, the request of USEPA that the need for the facility be considered in our decision, and the testimony that it was the best available site in the St. Louis metropolitan area for the disposal of hazardous, nonnuclear wastes. Evidence was also presented that in the absence of the few available landfills, hazardous wastes would be disposed of by dumping in waterways, along roadsides or in other improper places causing far greater danger than any resulting from the Wilsonville landfill.

As one of its key points, defendant argues that the trial court erred in failing to balance the described urgent public need for the landfill against any harm or danger of future harm found by the court to exist. That procedure is part of a doctrine called "balancing of equities." (Annot., 40 A.L.R. 2d 1177, 1187 (1955).) The case law of this State does not present a clear picture of the circumstances, if any, in which the trial court is required to do this balancing in a case of this nature.

In *Barrington Hills Country Club v. Village of Barrington* (1934), 357 Ill. 11, 191 N.E. 239, the court in affirming a trial court's order enjoining a village's discharge of sewage and efflux from its plant into a stream, stated that no balancing was required. Subsequently in *Haack v. Lindsay Light & Chemical Co.* (1946), 393 Ill. 367, 66 N.E.2d 391), the court reversed the granting of an injunction against the defendant's operation of a chemical plant which issued various vapors, smoke and smell. The supreme court determined the damage to be trivial and stated,-

"It is apparent from this record that appellant was not only

engaged in a lawful business but was, at the time of this hearing, engaged in essential war work which would have been seriously impaired had it been required by injunction to cease operations. *Such may be considered in determining whether the operation of its plant is unreasonable.* [Citation.]" (Emphasis added.) 393 Ill. 367, 375, 66 N.E.2d 391, 394.

Several appellate court decisions have referred to *Barrington* and *Haack*. In *Fisk v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 218 N.E.2d 240, the trial court had refused to enjoin the defendant's building of a dam in a stream but had enjoined its discharge of sewage treatment plant effluent into that stream. In affirming, the appellate court said that *Haack* overruled *Barrington* in part and indicated that they based their decision fully upon the availability to defendant of an alternate method of treating the sewage without discharging the effluent. In *Smith v. City of Woodstock* (1974), 17 Ill. App. 3d 948, 309 N.E.2d 45, a similar injunction against the emission of sewage plant effluent was reversed for the failure of the trial court to consider whether another method of treating the sewage was reasonably available. The opinion stated that *Haack* did not overrule *Barrington* but merely modified it by permitting the trial court to balance the equities.

In *City of Chicago v. Commonwealth Edison Co.* (1974), 24 Ill. App. 3d 624, 321 N.E.2d 412, the trial court's refusal to enjoin operation of defendant's facility as a nuisance was affirmed. The court reasoned that the city's evidence was not sufficient to prove a substantial harm or injury to the public. The opinion recognized that air pollution was damaging to health but stated:

"As a result of industrial expansion, the courts have utilized several factors in determining whether an industrial operation is an unreasonable interference with the right to clean air. One of those factors is the extent of injury or harm incurred to the public health, safety, peace or comfort. Another is a comparison of the operation's methods or effects to proscribed standards outlined by applicable federal, state, or local regulations. A third is the suitability of the industry's location. A fourth factor involves balancing the gravity of the harm done to the public against the utility of the defendant's business to the community as a whole." 24 Ill. App. 3d 624, 632, 321 N.E.2d 412, 418.

In *Harrison v. Indiana Auto Shredders Co.* (7th Cir. 1976), 528 F.2d 1107, the district court enjoined the operation of the defendant's auto shredding plant as a common-law and statutory nuisance because of the dust, noise and vibration it engendered. The circuit court of appeals concluded that a sufficient showing of a nuisance had been made but that after so deciding the district court should have then balanced the injury to

the plaintiffs against the social utility of the shredder plant. The circuit court reversed holding that the remedy of injunction shutting down the operation was too severe considering the value of the operation not only because of its contribution to the economy but because of its function in combatting pollution by disposing of old cars. Nevertheless, the opinion also stated:

> "Of course, where the pollution from a mill or factory creates hazards that imminently and dangerously affect the public health, the appropriate relief is a permanent injunction against the continuation of the polluting activities. It would be unreasonable to allow a private interest in the profits and product of such a polluting menace to outweigh the community's interests in the health of its citizens. However, a permanent injunction that shuts down a mill or factory without consideration of the extent of the harm that its pollution caused would be equally unreasonable." 528 F.2d 1107, 1122-23.

The record in the case on appeal indicates that the trial court acknowledged the need for the landfill facility and the substantial investment defendant had made in it but stated in its memorandum opinion, "The court will not balance public benefit or public inconvenience against the individual right," thus, apparently refusing to engage in the balancing.

As we have indicated, we consider the extremely serious nature of the possible harm foreseen by the court to override the fact that it is remote. We deem this same factor to also justify the court's refusal to balance the harms and the benefits. The Illinois decisions generally indicate a requirement for balancing, but those decisions do not involve harm of the magnitude threatened here. In *Harrison,* the harm from the dust, noise and vibration from the auto shredder might be equated to the actual harm from dust and odors to which plaintiffs' witnesses testified here. The *Harrison* court performed this balancing and found the remedy of shutting down the facility to be too severe, but the opinion indicated that balancing was not required when the operation under challenge "creates hazards that imminently and dangerously affect the public health * * *." (528 F.2d 1107, 1122-23.) Here, under the theory of the commentary of the Restatement (Second) of Torts, the severity of the danger was so great that it did not need to be imminent. The trial court did not err in failing to balance the harms and and the benefits.

For much the same reasons, the court did not err in fashioning the relief granted which ordered a shutdown of the landfill and a removal of the hazardous substances buried there. Rearrangement of substances found to be incompatible and future segregation of them could have been

attempted as a cure for the danger of fire, explosion or gas emission. Safer methods of transportation could also have been ordered if all trucks carrying substances through the Village were required to have closed beds and all substances were required to be shipped in closed barrels. Perhaps smell and dust could have been reduced by closer regulation at the site, but nothing was shown to indicate that the threat of migration of the buried chemicals could have been overcome by court imposed conditions. Argument could be made that some substances like PCB had so little tendency to migrate that it would be unnecessary to remove that previously deposited or to prohibit further deposit in the future, but the trial court could have found that PCB was sufficiently soluble in water that it could escape.

The remaining issues are less difficult.

On May 4, 1977, in the first case, defendant filed a motion for change of venue from Judge John Russell. Prior to that, Judge Russell had granted a preliminary injunction in that case against defendant on April 18, 1977, and, after a contested hearing, refused to dissolve the injunction on April 21, 1977. On May 11, 1977, Judge Russell denied the motion on grounds that it was not timely filed. The proceeding brought by the Attorney General was filed May 26, 1977. On June 1, 1977, the Attorney General filed an amended complaint for an immediate injunction and requested expedited discovery. The matter was heard *ex parte* by Judge Russell pursuant to section 43 of the Environmental Protection Act (Ill. Rev. Stat. 1977, ch. 111½, par. 1043) and taken under advisement. The next day, in a sequence not discernible by the record, the court denied all relief requested by the Attorney General the previous day and defendant filed a motion for change of venue from Judge Russell in the second case. That motion was argued and denied the next day. Judge Russell presided throughout the trial on the merits.

■■ A party to a civil case is entitled to a change of venue where he or his attorney fears that the judge assigned to the case is prejudiced against him (Ill. Rev. Stat. 1977, ch. 110, par. 501(2)) if a motion for a change of venue from that judge is made "before trial or hearing begins" and before he has "ruled on any substantial issue in the case, *provided that if any grounds for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such grounds*" (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 110, par. 503). Prior to 1971 the underlined provisions were not in the statute and no provision existed to move for change of venue after a substantial ruling had been made. Even under the new provisions, however, a party is not permitted to wait until he can determine a judge's attitude on an issue by seeing how the judge rules and then make a general allegation that the judge is prejudiced; and the judge still has considerable

discretion in ruling on such a motion. *Templeton v. First National Bank* (1977), 47 Ill. App. 3d 443, 362 N.E.2d 33; *cf. Delta Oil Co. v. Arnold* (1978), 66 Ill. App. 3d 375, 384 N.E.2d 25.

■■ In the first case, the motion for change of venue was filed after the trial court had refused to dissolve a temporary injunction. Such a ruling is on a substantial issue. (*Board of Junior College District No. 508 v. Cook County College Teachers' Union* (1970), 126 Ill. App. 2d 418, 262 N.E.2d 125.) Moreover, in making the ruling, the trial court considered such matters as subject matter jurisdiction and the effect to be given to the IEPA permits. The only specific allegation of prejudice made against Judge Russell in the motion for change of venue stated that he had shown prejudice by his ruling on the motion to dissolve. The first motion for change of venue was not timely filed and the court properly denied it.

■■ The propriety of the ruling denying the motion for change of venue in the second case is more complicated because that motion was filed before the judge had ruled on any motion about which defendant had notice. In fact, it may have been filed before a ruling had been made on any matter. However, in *Marshall Savings & Loan Association v. Henson* (1966), 78 Ill. App. 2d 14, 222 N.E.2d 255, three separate cases involving the solvency of the same financial institution, which the appellant said should have been consolidated, existed in the trial court. Rulings on substantial issues were made in two cases by the same judge, whereupon a party made a motion for a change of venue from the same judge in the third case although no such decisions had been made in the third case. The denial of the motion was affirmed on appeal. The analogy to the instant case is very close. *Marshall Savings & Loan Association* was decided before the new legislation was enacted, but the motion for change of venue did not have the specific allegations of prejudice necessary to bring the motion within its provisions.

■■ Certain other points raised by defendant may be answered summarily. Defendant maintains that the governmental action prohibiting it from using its landfill, after governmental license to do so, deprives it of property without just compensation. In *Hughes v. State of Washington* (1967), 389 U.S. 290, 19 L. Ed. 2d 530, 88 S. Ct. 438, the concurring opinion of Mr. Justice Stewart stated that a sudden change in State law affecting property interests may constitute a taking of property. Regardless of whether the foregoing concurrence is precedent, we do not consider the trial court's enjoining of activity licensed by another branch of government to be a change of law. Regardless of whether the operation has been licensed, it must still be operated in a way that does not constitute a nuisance. We do not agree with the trial court that misrepresentation, if any, made by defendant as to the use to which the site was to be put made the site a nuisance, but any error in making that

finding does not affect the propriety of other findings or rulings made by that court. We find no reversible error, either singly or cumulatively in the trial court's evidentiary rulings.

We have determined that (1) the trial court had jurisdiction, (2) it was not required to defer to proceedings that might be brought before administrative agencies, (3) the evidence supported the court's conclusion, implicit in its statements and rulings, that the operation of the landfill threatened a catastrophe, (4) the serious nature of the threat justified issuance of the injunction although (a) the possible catastrophe was remote in time and uncertain of occurrence, and (b) the court did not balance the benefits of the landfill against the harms that might result, and (5) no reversible error resulted from other rulings made during the lengthy proceeding.

We recognize that defendant has made a considerable investment here seeking to provide a needed service and acting partly in reliance upon IEPA permits and licenses. We recognize that our decision may deter others from entering the field. We are also aware of the need of IEPA and USEPA for proper facilities for disposing of hazardous materials. As we have indicated, however, the evidence casts serious doubts upon whether the instant site meets IEPA standards for soil porosity and containment without engineering.

For the reasons stated, the judgment appealed is affirmed.

Affirmed.

MILLS and TRAPP, JJ., concur.